## STATE OF CONNECTICUT *v.* RICARDO COLLINS
### (SC 18297)

Norcott, Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued April 26, 2010—officially released January 5, 2011**

** January 5, 2011, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Adam E. Mattei*, special deputy assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, *Jonathan C. Benedict*, former state's attorney, and *Howard S. Stein*, assistant state's attorney, for the appellant (state).

*Pamela S. Nagy*, special public defender, for the appellee (defendant).

*Opinion*

NORCOTT, J. The principal issue in this certified appeal is whether the trial court properly admitted, under § 4-5 of the Connecticut Code of Evidence,[1] uncharged misconduct evidence concerning the defendant's involvement in a prior shooting using the same gun that was the murder weapon in the present case. The state appeals, upon our grant of its petition for certification,[2] from the judgment of the Appellate Court

---

[1] Section 4-5 of the Connecticut Code of Evidence provides in relevant part: "(a) Evidence of other crimes, wrongs or acts inadmissible to prove character. Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person.

"(b) When evidence of other crimes, wrongs or acts is admissible. Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony. . . ."

[2] We granted the state's petition for certification limited to the following issue: "Did the Appellate Court properly conclude that the trial court abused its discretion when it admitted evidence of the defendant's involvement in a prior shooting?" *State* v. *Collins*, 290 Conn. 911, 964 A.2d 546 (2009).

reversing the judgment of conviction of the defendant, Ricardo Collins, of murder in violation of General Statutes § 53a-54a (a), felony murder in violation of General Statutes § 53a-54c and robbery in the first degree in violation of General Statutes § 53a-134 (a) (2). *State* v. *Collins*, 111 Conn. App. 730, 961 A.2d 986 (2008). The state claims that the Appellate Court improperly determined that the trial court had abused its discretion by admitting evidence of the defendant's involvement in the earlier nonfatal shooting of Stephen Rose, his cousin's husband (Rose shooting). The defendant contends otherwise, and also posits, as alternative grounds for affirming the judgment of the Appellate Court, that the trial court improperly: (1) instructed the jury that the adequacy of the police investigation was not at issue in the case; and (2) determined that he had waived his right to counsel knowingly, voluntarily and intelligently. We reverse the judgment of the Appellate Court.

The record reveals the following relevant facts, which the jury reasonably could have found, and procedural history, much of which are set forth in the opinion of the Appellate Court.[3] "The [murder] victim, Calvin Hopkins,[4] and his former girlfriend, Quiana Staton, jointly operated a 'business' in which Staton sold marijuana and Hopkins sold crack cocaine. At approximately 10:30 on the night of December 2, 2002, Hopkins went to Staton's Bridgeport apartment in a public hous-

---

[3] We note that the Appellate Court's recitation of the facts in this case includes a detailed description of the facts that the jury reasonably could have found after the defendant's separate trial on numerous charges arising from the Rose shooting, as set forth in *State* v. *Collins*, 100 Conn. App. 833, 836, 919 A.2d 1087, cert. denied, 284 Conn. 916, 931 A.2d 937 (2007). See *State* v. *Collins*, supra, 111 Conn. App. 734–35. Because that evidence was not adduced at the trial in the present case and, therefore, was not considered by the jury herein, we agree with the state that it is not appropriate for us to consider that evidence in deciding this appeal.

[4] "[Hopkins] was alternatively known as Calvin Atkins and 'C-Hop.' " *State* v. *Collins*, supra, 111 Conn. App. 732 n.2.

ing project known as the Greens. He came to the apartment carrying a large 'wad of cash' and retrieved an additional $500 to $600 from Staton's safe. Staton testified that Hopkins intended to use the money to purchase additional crack cocaine. Hopkins left Staton's apartment with the money at approximately 12 a.m. on the morning of December 3, 2002. He spoke to Staton on his cellular telephone approximately one hour later from his car in the parking lot of the apartment complex. During that conversation, Staton looked from her window to see Hopkins in his car talking to two unknown individuals. Staton later attempted to call Hopkins' cellular telephone at approximately 2 a.m. and again at 3 a.m. but received no answer to either of those calls.

"Later that morning, at approximately 7:15, Bridgeport police were dispatched to a scene a short distance from Staton's apartment complex where a green sedan was parked in the road preventing a school bus from passing. Upon opening the door to the vehicle, the police discovered Hopkins 'reclined in the front seat with his head leaning back and what appeared to be a large amount of blood in the interior of the vehicle.'

"At the scene, a physician from the medical examiner's office recovered a bullet shell casing from Hopkins' collar, and the currency that Hopkins had been carrying in the earlier hours of the morning was not found on his body. Two anomalous fingerprints were found on the vehicle: the defendant's fingerprint was found on the exterior of the rear driver's side door and that of another individual, Anthony Berrios, was found on the exterior of the front passenger door. An autopsy later revealed that Hopkins died from a gunshot wound to the head, and bullet fragments were recovered from his head.

"The defendant became a suspect in this case because of his involvement in the [Rose shooting] in August,

2002. A firearms examiner testified at trial that the shell casing recovered from Hopkins' collar at the scene of the homicide was fired from the same weapon that had been used in the [Rose shooting]." Id., 732–34.

"The defendant turned himself in to the Bridgeport police in January, 2003, for the Rose shooting. During the course of the police questioning, the defendant admitted to shooting Rose [with a chrome and black nine millimeter handgun] but also indicated that he had since sold the gun.[5] . . . While in police custody for

[5] Specifically, in his statement taken by Robert Winkler, a Bridgeport police detective, the defendant averred that he had shot Rose after Rose attacked him physically:

"Q. What do you have to tell me regarding the incident that occurred on August 28, 2002, on Pembroke Street?

"A. I was leaving my apartment on Pembroke Street, I was only living there for about two . . . weeks, I don't remember the number, but it was near Marlborough Court. I saw my cousin's husband, [Rose]. He was in a white livery cab, he was circling around and came back. He threw the car in park and ran up on me.

"Q. How long have you known [Rose]?

"A. He's married to my cousin, Jessenia.

"Q. I'm showing you a picture, can you tell me if you know this person?

"A. Yea, that's [Rose], he's married to Jessenia."

"***[The defendant] signed and dated the back of the photo at this time***

"Q Go on.

"A. He was yelling and screaming at me. He was accusing me of crashing his wife's car.

"Q. What kind of car?

"A. A Corolla, grey.

"Q. Okay. He's yelling at you and then?

"A. I was trying to walk away and he kept getting in my face. He took a swing at me. He hit me hard in the face.

"Q. What did you do after he hit you in the face?

"A. I had a gun on my side, so I shot him.

"Q. How many times did you shoot him?

"A. I don't know.

"Q. What kind of gun was it?

"A. I know it was a nine. You just touch the trigger and the bullets keep coming out. It was a chrome with black in it.

"Q. Did any of the bullets hit him?

"A. At first I thought I didn't hit him [because] he went to hit me again.

"Q. Did you keep shooting?

"A. There were no bullets left.

the Rose shooting, the defendant was also questioned with regard to the Hopkins homicide. In his statement to police, the defendant admitted meeting with Hopkins in his car to purchase drugs during the night of December 2, 2002, but denied killing him." (Citation omitted.) Id., 735.

The jury reasonably could have found the following additional facts demonstrating, however, that the defendant did not actually dispose of the chrome and black nine millimeter handgun that he had used in the Rose shooting and, indeed, used it to kill Hopkins in the course of robbing him. Specifically, Ryshon Penix, the defendant's cousin, also lived in the Greens housing project. When the defendant visited him there on November 28, 2002, several days before Hopkins' death, both Penix and Ivan Ramos, his roommate, noticed

"Q. And then?

"A. We were locked up, he was still swinging at me.

"Q. And then?

"A. I get him off me and then he said the cops were on their way. I just left.

"Q. Where did you go?

"A. To the [e]ast [e]nd, to Smith Street, my aunt's house.

"Q. How did you get to Smith Street?

"A. I called my uncle from my cell phone, he picked me up and brought me to the east end.

"Q. What happened to the gun?

"A. I sold it to someone, I don't know who. I got [$300] for it.

"Q. Where have you been staying since this incident?

"A. Everywhere, I left the state once, I went to New York. Everywhere else was in Bridgeport.

"Q. Did you know the police were looking for you?

"A. Yea.

"Q. And that there was a warrant for your arrest?

"A. Yea.

"Q. Why did you turn yourself in?

"A. I was talking to my mother. I was telling her that I can't even step outside, it was like being in jail, I can't work. She brought someone from the church to talk to me and we decided to call the police.

"Q. Is there anything else that you would like to add that you feel is important?

"A. Basically I do regret it [because] it caused me to lose my job and apartment."

that the defendant had with him a chrome and black handgun. Further, Kimberly Finney, who had been incarcerated with the defendant at the Bridgeport correctional center, testified that the defendant had confessed to him in a conversation in the dayroom there that he had murdered Hopkins while robbing him. Finney testified specifically that the defendant, while evading the police investigation of the Rose shooting, had unsuccessfully attempted to support himself by selling drugs in the Greens housing project, turned to robbery instead, and elected to rob Hopkins because the defendant, who had purchased drugs from Hopkins before, had seen him with a lot of money. After arranging to meet with Hopkins, ostensibly to purchase drugs, the defendant then attempted to rob Hopkins in his car, and shot him when Hopkins resisted. The defendant told Finney that he had turned himself in for the Rose shooting in an attempt to avoid being considered a suspect in the Hopkins case, figuring that "he [would] never become a suspect in the [Hopkins] case because he had been in jail already."

"The defendant's initial trial for Hopkins' murder was declared a mistrial after the jury returned deadlocked. At the subsequent trial,[6] which resulted in the conviction, from which the defendant appeals, the state sought to introduce evidence of the defendant's role in the Rose [shooting], to which the defendant objected.[7] The defendant, who was representing himself at the time, argued that any testimony regarding the Rose shooting would be 'highly prejudicial' and of little probative value. He further argued that '[t]he state . . . has me

[6] Finney testified that he decided to inform on the defendant and testify at this second trial in the hope of receiving leniency on his own pending cases, and because he realized that the defendant's admissions would be valuable to the prosecution, because the defendant's first trial had resulted in a hung jury.

[7] "The defendant's initial objection to the testimony took the form of an oral motion in limine." State v. Collins, supra, 111 Conn. App. 735 n.4.

testifying that I had a gun and it got other evidence, and I was convicted of it, and I really don't see a need for this testimony here because . . . it would inflame the jury . . . . I'm on trial right now for this murder case, and it's a shooting case. It's two shooting cases. And if they was to bring [Rose], I think . . . no matter what your instruction would be to the jury . . . that it still would be lingering in them that somebody got shot. And I would ask that you not allow it in.'

"The court determined that the probative value of the evidence outweighed its potential for unfair prejudice; see Conn. Code Evid. § 4-3;[8] and overruled the defendant's objection. It did, however, instruct the jury that the evidence could not be used to infer bad character of the defendant or his tendency to commit criminal acts. The defendant later objected to similar testimony, which was also overruled.

"During deliberations, the jury twice communicated to the court that it was unable to reach a unanimous verdict as to one of the counts charged. After each communication from the jury, the court instructed it to continue its deliberations, the second time giving a formal Chip Smith instruction.[9] The jury eventually returned a verdict of guilty of murder, felony murder and robbery in the first degree on March 21, 2006. The court rendered judgment in accordance with the jury's verdict, and the defendant was sentenced to forty-five years in prison on the merged counts of murder and felony murder and ten years on the count of robbery

---

[8] Section 4-3 of the Connecticut Code of Evidence provides: "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."

[9] "The purpose of the [Chip Smith] instruction is to prevent a hung jury by urging the jurors to attempt to reach agreement. It is a settled part of Connecticut jurisprudence . . . ." (Internal quotation marks omitted.) *State* v. *Collins*, supra, 111 Conn. App. 736 n.5.

in the first degree." *State* v. *Collins*, supra, 111 Conn. App. 735–36.

The defendant appealed from the judgment of conviction to the Appellate Court, claiming, inter alia,[10] that the introduction of evidence concerning his involvement in the Rose shooting deprived him of a fair trial because its prejudice to the defense exceeded its probative value. Id., 737. The Appellate Court agreed, concluding that the trial court had abused its discretion by admitting the uncharged misconduct evidence. Id., 743–44. The Appellate Court further concluded that the defendant had proven that the improper admission of this evidence was harmful, given the lack of direct evidence linking him to Hopkins' death and multiple reports of jury deadlock in this case. Id., 744. Accordingly, the Appellate Court reversed the judgment of conviction and ordered a new trial. Id. This certified appeal followed. See footnote 2 of this opinion.

On appeal, the state contends that the Appellate Court improperly determined that the trial court had abused its discretion by admitting evidence of the Rose shooting, because: (1) such evidence was relevant to prove the defendant's identity as the shooter in this case, as well as his motive for robbing Hopkins; and (2) the trial court's jury instructions, and the limited nature of the specific evidence that was admitted, rendered it not unduly prejudicial. In response, the defendant contends otherwise, and also posits, as alternative grounds for affirming the judgment of the Appellate

---

[10] Because it did not deem them likely to arise on remand, the Appellate Court did not address the defendant's other claims on appeal, namely, that "(1) an improper jury instruction regarding the defense theory deprived him of his rights pursuant to the fifth, sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution and (2) the court permitted the defendant to waive his right to competent counsel without properly determining that such waiver was voluntary, intelligent and knowing." *State* v. *Collins*, supra, 111 Conn. App. 732 n.1.

Court pursuant to Practice Book § 84-11, that the trial court: (1) improperly instructed the jury that the adequacy of the police investigation was not an issue in the case; and (2) inadequately canvassed the defendant to determine whether his waiver of his right to counsel was knowing, voluntary and intelligent. We address each claim in turn, and set forth additional relevant facts and procedural history in the context of each claim.

I

Relying on, inter alia, *State* v. *Sharpe*, 195 Conn. 651, 491 A.2d 345 (1985), and *United States* v. *Higgs*, 353 F.3d 281 (4th Cir. 2003), cert. denied, 543 U.S. 999, 125 S. Ct. 627, 160 L. Ed. 2d 456 (2004), the state claims that the Appellate Court improperly concluded that the trial court abused its discretion by admitting evidence of the Rose shooting, the probative value of such evidence exceeding any unduly prejudicial effect because, when viewed in the context of testimony by Penix and Ramos showing that the defendant was in possession of a black and chrome nine millimeter handgun shortly before the murder, it linked a gun owned and used by the defendant to the shooting of Hopkins in this case. The state also argues that this testimony was corroborative of Finney's jailhouse informant testimony. The state emphasizes that the evidence could not have unduly aroused the jury's emotions because Rose did not testify, and the evidence did not involve the extent of his injuries or whether the defendant had been convicted of a crime in connection therewith; indeed, the state contends, any details came only from the defendant's statement to the police that he had shot Rose in self-defense.[11]

In response, the defendant argues that the Appellate Court properly determined that the trial court had

---

[11] The state also contends that the admission of this evidence, even if improper, was harmless.

abused its discretion because, although evidence that he had possessed the gun used in this case was relevant, the trial court failed to limit the evidence by excluding the highly prejudicial fact that the defendant had shot someone with the gun. The defendant relies on *State v. Mortoro*, 160 Conn. 378, 279 A.2d 546 (1971), *State v. Dunbar*, 51 Conn. App. 313, 721 A.2d 1229 (1998), cert. denied, 247 Conn. 962, 724 A.2d 1126 (1999), and *Thompson* v. *State*, 690 N.E.2d 224 (Ind. 1997), in further support of his argument that the evidence of the shooting was irrelevant and served solely to portray him in a bad light. The defendant also argues that the shooting evidence was not necessary to prove that the murder in this case was motivated by robbery, and that there was in fact evidence—namely, the testimony of Robert Winkler, a Bridgeport police detective, and Finney—to the effect that the defendant had in fact been convicted of a crime in connection with the Rose shooting. We agree with the state and conclude that the trial court did not abuse its discretion by admitting limited evidence about the Rose shooting.

The record reveals the following additional relevant facts and procedural history. After the testimony of Jessica Tillson, a Bridgeport police officer who was the state's first witness, the defendant, who at the time was representing himself with the aid of standby counsel; see part III of this opinion; argued against the admissibility of Rose's testimony.[12] The defendant claimed that Rose's testimony would be "highly prejudicial to the jury and clearly outweighs the probative value. The state . . . has me testifying that I had a gun and it [has]

---

[12] Shortly before Tillson's testimony, the defendant had broached this issue first, stating, "the testimony of Rose, it's highly prejudicial." The court replied: "[I]f you have an issue with his testimony, we'll argue . . . your objection before he takes the stand." The court considered the issue prior to the testimony of Joseph Gallagher, a Bridgeport police detective, because the prosecutor had advised the court that his testimony was likely to encompass the Rose shooting.

other evidence, and I was convicted of it, and I really don't see a need for this testimony here because . . . it would inflame the jury because I'm already convicted . . . of this case . . . and I'm on trial right now for this murder case, and it's a shooting case. It's two shooting cases. And if they [were] to bring [Rose to testify], I think . . . no matter what your instruction would be to the jury, that it . . . still would be lingering in them that somebody got shot. And I would ask that you not allow it in." The prosecutor, noting that Joseph Gallagher, a Bridgeport detective, would testify about his activities in processing the crime scene of the Rose shooting at Pembroke and Jane Streets in Bridgeport, observed that Rose had testified at the probable cause hearing and stated that Marshall Robinson, the state's firearms expert, would testify "that based upon his training and experience . . . the firearm that was used in the shooting of [Rose] was, in fact, the same firearm that was used in causing the death of [Hopkins]." The prosecutor argued that the defendant's act of shooting Rose was "prior misconduct" that was admissible because Rose would testify that "the person who was in possession of this common firearm at the time of his shooting was . . . the defendant . . . ." Relying on *State* v. *Sharpe,* supra, 195 Conn. 651, the prosecutor noted the availability of the "common limiting instruction" that "the evidence which [the jury is] about to hear is not being offered for the purpose of showing that the defendant is of bad character or anything regarding his propensity to commit crime," and argued that the defendant's actions in shooting Rose would be admissible under § 4-5 (b) of the Connecticut Code of Evidence, to prove identity, identity as an element of the crime charged, and under the catchall provision "to corroborate crucial prosecution testimony." The prosecutor stated that proof of the defendant's access "to the instrumentality of the crime" would permit "the

jury, through circumstantial evidence . . . to develop a chain of evidence that would tend to indicate that the defendant was responsible for this crime." The state then argued that the probative value of the evidence would outweigh its prejudicial effect, particularly given the limiting instruction, which the prosecutor noted was used successfully in the defendant's first trial.[13]

The trial court concluded that the evidence of the Rose shooting could be admitted to prove the defendant's specific intent to commit murder, the identity of the person who shot Hopkins, and to corroborate the crucial testimony exception because "one person who . . . allegedly can tie in the defendant to . . . that gun on that date [is] Rose." The court then concluded that the prejudicial effect of the evidence did not outweigh its probative value with respect to the state's case, and noted that limiting instructions would be given prior to Gallagher and Rose's testimony.

[13] In response, the defendant reiterated that Rose's testimony would be "highly prejudicial" because of the nature of the case, and he noted that the state already had his statement "admitting . . . having the gun . . . that shot . . . Rose and they [have] the shell casings." The prosecutor then stated that any testimony by Gallagher and Rose would be "very narrow"; Gallagher's testimony would be limited to the physical evidence recovered at the scene; and Rose's testimony would be limited to "plac[ing] him at Pembroke and Jane [Streets] on a time, place and date to indicate that he had been shot by the defendant on that date at that location, which would close the loop then, and not to go into any further detail. . . . [T]here's no need to go into the facts of that matter, other than that the defendant was the person who, in fact, was in possession of the gun on that date."

For his part, the defendant's standby counsel suggested that the prosecutor have Rose eliminate his statement that he was shot, and merely place the defendant at that scene "firing a gun that he can identify," to be linked to the shooting of Hopkins by Gallagher's testimony. Standby counsel indicated that the most prejudicial aspect of the evidence would be Rose's statement that the defendant "shot him," which "certainly would affect the jury's opinion of [the defendant's] character, or his propensity for violence." The state disagreed, however, and emphasized that Rose's testimony that the defendant shot him would be crucial identification testimony under § 4-5 (b) of the Connecticut Code of Evidence.

After Gallagher testified regarding his actions at the crime scene in this case, the prosecutor shifted his focus on direct examination to the scene of the Rose shooting. After the defendant noted his continuing objection, Gallagher identified five nine millimeter shell casings that he had collected from the scene of the Rose shooting.[14]

On the second day of the defendant's cross-examination of Gallagher, prior to the start of questioning, the trial court delivered a limiting instruction to the jury advising it that, with respect to the events of August 28, 2002, the date of the Rose shooting, it could consider that testimony or evidence only for the "limited purposes . . . on the issues of intent, element of a crime or opportunity," and that the jury was "expressly prohibited from using that evidence as evidence of any bad character of the defendant, or as any evidence [of] a tendency on his part to commit criminal acts."[15] The trial court reminded the jury of this limiting instruction several times, including after the testimony of Finney

[14] We note that, at the request of the defendant, the trial court directed the redaction of references to assault charges on the evidence labels on the bags that held the five Rose shooting shell casings.

[15] The complete limiting instruction, to which the defendant had no objection, directed the jury that it "can consider the testimony or evidence for a limited purpose only and for no other purpose. The limited purposes are on the issues of intent, element of a crime or opportunity. The evidence which you have heard and will hear about these issues is limited to those limited purposes. The bottom line very simply is that these are very limited purposes for which the testimony is being offered and those are the—those which I have just identified for you. You are expressly prohibited from using that evidence as evidence of any bad character of the defendant, or as any evidence as a tendency on his part to commit criminal acts. If you find the evidence credible, and further find it logically and rationally supports the issues for which it is being offered by the state, you may consider it for the sole and limited purposes that I have indicated. It cannot be considered for any other purpose.

"On the other hand, if you do not believe such evidence, and even if you do, if you find that it does not logically and rationally support the issues for which it is being offered, you would not consider it for any purpose."

and Robinson, and during the final charge. We note that Rose never testified at this trial, and that the only evidence admitted that described the Rose shooting in any detail was the defendant's statement, which was admitted with his agreement. See footnotes 5 and 20 of this opinion.

Before examining the decision of the Appellate Court, we note that, "[a]s a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . On the other hand, evidence of crimes so connected with the principal crime by circumstance, motive, design, or innate peculiarity, that the commission of the collateral crime tends directly to prove the commission of the principal crime, is admissible. The rules of policy have no application whatever to evidence of any crime which directly tends to prove that the accused is guilty of the specific offense for which he is on trial. . . . We have developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions [set forth in § 4-5 (b) of the Connecticut Code of Evidence]. . . . Second, the probative value of the evidence must outweigh its prejudicial effect. . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *State* v. *Randolph*, 284 Conn. 328, 340, 933 A.2d 1158 (2007).

"The well established exceptions to the general prohibition against the admission of uncharged misconduct are set forth in § 4-5 (b) of the Connecticut Code of Evidence, which provides in relevant part that '[e]vidence of other crimes, wrongs or acts of a person is admissible . . . to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony.' " *State* v. *Beavers*, 290 Conn. 386, 400, 963 A.2d 956 (2009).

The Appellate Court's decision did not address the first prong of the uncharged misconduct inquiry, appearing to assume, but without specifically indicating, that the trial court properly had determined that evidence that the defendant had shot Rose with the same handgun that was used to murder Hopkins was relevant under either of the corroboration[16] or iden-

---

[16] Under the exception to § 4-5 (b) of the Connecticut Code of Evidence permitting uncharged misconduct evidence to be used to "corroborate crucial prosecution testimony," "the prosecution is not permitted to wholesale proof into evidence under the guise of corroboration purposes. . . . To avoid potential prosecutorial abuse, we have required the proponent of the evidence to demonstrate a close relationship between the proffered evidence and the evidence to be corroborated. Other crimes evidence, therefore, is only admissible for corroborative purposes, if the corroboration is direct and the matter corroborated is significant. . . .

"Under this test, significant evidence is defined as important, as opposed to trivial, evidence. . . . Direct corroborating evidence is that which is not wholly disconnected, remote, or collateral to the matter corroborated. . . . The requirement that the corroborating evidence be direct is necessary in order to ensure that the link between the corroborative evidence and the facts to be inferred therefrom is not too attenuated or nonprobative; otherwise, the evidence might unfairly reflect upon the defendant's propensity to commit crimes." (Citations omitted; internal quotation marks omitted.) *State* v. *Mooney*, 218 Conn. 85, 128–29, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991); see also id., 129–30 (permitting testimony by victim of other larcenies perpetrated by defendant because it directly corroborated testimony of impeached witness about defendant's practice of meeting with gay men for purpose of robbing or stealing from them); *State* v. *Sharpe*, supra, 195 Conn. 659–60 (noting that "extensive testimony concerning the defendant's purchase of a pistol and his subsequent

tity[17] exceptions set forth in § 4-5 (b) of the Connecticut

report of its theft just prior to the shooting" "tended also to corroborate the other direct testimony that shell casings found at the scene of the shooting probably came from a gun of the type purchased by the defendant"); *State* v. *Blango*, 103 Conn. App. 100, 110, 927 A.2d 964 (evidence that defendant displayed gun during "two separate incidents" corroborated victim's contested testimony "that the defendant threatened her with a gun in order to compel her to perform oral sex, an essential element of the charges against him" particularly because "it established that, approximately two weeks after the sexual assault, the defendant had a gun in his possession that was similar to the gun she testified was used in the assault"), cert. denied, 284 Conn. 919, 933 A.2d 721 (2007).

[17] "The signature test ordinarily is used to determine whether evidence of uncharged misconduct is admissible under . . . the identity exception. See Conn. Code Evid. § 4-5 (b). Specifically, the test is used to discern whether evidence of uncharged misconduct is admissible to prove the identity of the defendant as the perpetrator of the crime charged." *State* v. *Randolph*, supra, 284 Conn. 351; see also *State* v. *Boyd*, 295 Conn. 707, 743, 992 A.2d 1071 (2010) (admissibility under identity exception is not propensity evidence, but relies on "similarity" of prior and charged conduct "to show the defendant, and not another person, had engaged in that conduct toward the victim"). "To be admissible for that purpose, the factual characteristics shared by the charged and uncharged crimes must be sufficiently distinctive and unique as to be like a signature [so that] it logically could be inferred that if the defendant is guilty of one [crime] he must be guilty of the other." (Internal quotation marks omitted.) *State* v. *Snelgrove*, 288 Conn. 742, 765, 954 A.2d 165 (2008).

Numerous federal and state courts have concluded that, in the context of uncharged misconduct, a defendant's use of the same gun used to commit the charged offense constitutes a "signature" for purposes of the identity exception. See, e.g., *Williams* v. *Stewart*, 441 F.3d 1030, 1040 (9th Cir.) ("[t]hat the same gun belonging to [the defendant] was used to shoot at [one victim] and to kill [another victim] is a signature element that links [the defendant] to both burglaries"), cert. denied, 549 U.S. 1002, 127 S. Ct. 510, 166 L. Ed. 2d 381 (2006); *United States* v. *Higgs*, supra, 353 F.3d 312 (evidence of defendant's involvement in nightclub shooting properly admitted under identity exception because it linked him "to the same caliber weapon that [the witness] testified [the defendant] owned and retrieved from the drawer on the night of the murders, and one which shared the same rifling characteristics as did the murder weapon"); *Fernandez* v. *State*, 722 So. 2d 879, 880 (Fla. App. 1998) ("[B]oth crimes occurred in the same area, and involved the same gun and the same automobile. Evidence of the prior shooting was relevant to issues of identity and motive and was properly admitted."); *State* v. *Lemons*, 348 N.C. 335, 352, 501 S.E.2d 309 (1998) (evidence of uncharged robberies was relevant to prove identity in murder case because, inter alia, one victim "was shot in the back of the head using the

Code of Evidence.[18] Rather, the Appellate Court's analysis focused on the second prong of the test, and the defendant's claim "that the probative value of evidence of the Rose shooting did not overcome the risk of prejudice, even with the limiting instruction given by the court. He further asserts that although it may have been probative that he once owned a gun that produced shell casings that match the shell casing found on Hopkins' collar, the fact that he shot Rose with that gun was not necessary to prove any element of the state's case." *State* v. *Collins*, supra, 111 Conn. App. 742. The Appellate Court relied on *State* v. *Dunbar*, supra, 51 Conn. App. 313, and *State* v. *Mortoro*, supra, 160 Conn. 387–91,

same gun"), vacated on other grounds, 527 U.S. 1018, 119 S. Ct. 2363, 144 L. Ed. 2d 768 (1999); *Commonwealth* v. *Reid*, 533 Pa. 508, 513, 626 A.2d 118 (1993) ("[b]ecause empty shell casings from the same weapon were found at both murder scenes, and [the defendant] was identified as the handgun shooter in the second murder, in which a ten millimeter bullet was found in the victim's head, evidence of the second murder is admissible to establish [the defendant's] identity as the shooter in the first"); *State* v. *Stokes*, 381 S.C. 390, 405, 673 S.E.2d 434 (2009) (evidence that same gun was used in subsequent break-in by defendant was relevant to establish identity "[s]ince the victims in the instant case were unable to identify their attackers"); cf. *State* v. *Llera*, 114 Conn. App. 337, 344, 969 A.2d 225 (2009) ("the existence of the Glock was irrelevant to the existence of the nine millimeter Luger, except for the improper purpose of showing that the defendant had a propensity for carrying a gun").

[18] Relying on the trial court's limiting instruction, which directed the jury to limit its use of the Rose shooting evidence to the proof of intent, element of a crime or opportunity; see footnote 15 of this opinion and the accompanying text; the dissent posits that it "see[s] no reason to presume, as the majority does, that the Appellate Court assumed that the evidence was relevant for other purposes, such as corroboration or to prove identity" exceptions of § 4-5 (b) of the Connecticut Code of Evidence. See footnote 11 of the dissenting opinion. We disagree. Particularly given the absence of any attack by the defendant on the substance of the trial court's limiting instruction, the dissent's criticisms notwithstanding, our assumption is based on the trial court's contemporaneous explanation for its evidentiary ruling, in which the court stated that the Rose shooting evidence "fall[s] within one or more . . . exceptions to the rule" generally precluding the admission of prior misconduct," naming specifically intent, identity, corroboration of crucial testimony, opportunity and element of the crime as the applicable exceptions.

and determined that the trial court had abused its discretion in determining that the probative value of the evidence exceeded its prejudicial effect, concluding that "[t]he testimony relating to the Rose [shooting] clearly fits into the category of evidence that would have unduly aroused the jury's emotions and hostility. It painted the defendant as a gun toting criminal with a proclivity for shooting people. The evidence was not admissible for that purpose." *State* v. *Collins*, supra, 743. The Appellate Court also noted that "[t]he testimony of several individuals was introduced at trial regarding the Rose shooting. The portion of the testimony relevant to the crimes for which the defendant was on trial was simply that which would prove that he had at some time owned a gun that produces shell casings that match the one found on Hopkins' collar. It would have been sufficient for the state simply to introduce evidence to that effect without going into the details of the defendant's involvement with the [Rose shooting]." Id. The Appellate Court then concluded that the improper admission of this evidence was harmful and required it to order a new trial for the defendant. Id., 744; see id. (noting report of jury deadlock and fact that "[t]here was no eyewitness to the crime, and the only tangible evidence linking the defendant to the crime was the shell casing and a fingerprint").

Having reviewed the record in this case, we conclude that the Appellate Court improperly determined that the trial court had abused its discretion in determining that the prejudicial effect of the evidence that the defendant had shot Rose with the same gun used in Hopkins' murder did not unduly exceed its probative value.[19] In

[19] Although our focus in this certified appeal is on the decision of the Appellate Court; see, e.g., *State* v. *Saucier*, 283 Conn. 207, 221, 926 A.2d 633 (2007); which focused on the second prong of the uncharged misconduct inquiry, we also address the defendant's claim under the first prong of that inquiry, namely, that evidence of the Rose shooting was not relevant in this case. Along with the dissent, the defendant argues that evidence of the Rose shooting itself is irrelevant to prove the defendant's identity as the shooter,

determining whether the prejudicial effect of otherwise relevant evidence outweighs its probative value, we consider whether: "(1) . . . the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) . . . the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) . . . the evidence offered and the counterproof will consume an undue amount of time, and (4) . . . the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." *State* v. *DeMatteo*, 186 Conn. 696, 702–703, 443 A.2d 915 (1982).

First, the only evidence that described the Rose shooting in any detail was the defendant's statement

---

but concedes the relevance of evidence that the defendant, several months before Hopkins' murder, possessed and fired the weapon used in this case. We disagree, and conclude that the trial court did not abuse its discretion in determining that evidence of the defendant's involvement in the Rose shooting, using the same gun as was used in this case, was relevant to prove the defendant's identity as the shooter in this case, as well as to corroborate Finney's testimony to that effect. "Within the law of evidence, relevance is a very broad concept. Evidence is relevant if it has *any* tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact *even to a slight degree*, [as] long as it is not prejudicial or merely cumulative." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Bonner*, 290 Conn. 468, 496–97, 964 A.2d 73 (2009), discussing Conn. Code Evid. § 4-1. Given this broad definition, we view the distinction drawn by the defendant and the dissent—namely, that between simple prior possession of the murder weapon, and its actual use in the Rose shooting—as one of degree rather than kind. Thus, as is reflected in the Appellate Court's decision in this case, the analytical key to this particular evidentiary decision lies under the second prong of the uncharged misconduct test, namely, the degree to which the prejudicial effect of the otherwise relevant evidence outweighs its probative value.

to the police, which was admitted with his consent[20] and portrayed it as an act of self-defense. See footnote 5 of this opinion. This is significant because "[u]ncharged misconduct evidence has been held not unduly prejudicial when the evidentiary substantiation of the vicious conduct, with which the defendant was charged, far outweighed, in severity, the character of his prior misconduct."[21] (Internal quotation marks omitted.) *State* v. *Beavers*, supra, 290 Conn. 405; see id. (finding significant "that the prior misconduct evidence admitted involved only the defendant's actual, claimed or threatened damage of property for personal gain, as compared to the charged crime in the present case, which contemplated the intentional killing of a person for financial reasons"); see also *State* v. *Mooney*, 218 Conn. 85, 131, 588 A.2d 145 ("the seriousness of the subsequent crime, a larceny, pales in comparison to the robbery and felony

---

[20] We do not intimate in any way that the defendant's ultimate agreement to the admission of his statement waived this evidentiary claim. The defendant made clear his continuing objection to the admission of any evidence pertaining to the Rose shooting.

[21] The dissent echoes the Appellate Court's conclusion that the evidence of the Rose shooting offered in this case "clearly fits into the category of evidence that would have unduly aroused the jury's emotions and hostility [because it] painted the defendant as a gun toting criminal with a proclivity for shooting people." *State* v. *Collins*, supra, 111 Conn. App. 743. Acknowledging that "the state did not adduce details of the Rose shooting, and the shooting did not result in Rose's death," the dissent nevertheless argues that "it is unreasonable to suggest that evidence of the [Rose] shooting, which occurred just three months prior to the [shooting in this case], did not give rise to a significant degree of prejudice." Although we agree that the evidence of the Rose shooting adduced in this case certainly had some prejudicial effect, we do not view that prejudicial effect to be undue or unreasonable in light of the alternatives proffered by the defendant's standby counsel at trial, namely, a suggestion that evidence be limited to placing the defendant at a particular location in the city of Bridgeport discharging an identifiable firearm. See footnote 13 of this opinion. Even if the jury were somehow to view the defendant as simply having fired his gun into the air on that prior occasion, the trial court reasonably could have exercised its discretion to find that alternative no less prejudicial to the defendant's image as a responsible gun owner, than his statement that he shot Rose in self-defense.

murder charges for which the defendant was standing trial"), cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991); *State* v. *Zubrowski*, 101 Conn. App. 379, 393, 395–96, 921 A.2d 667 (2007) (uncharged misconduct evidence of defendant's past physically and verbally abusive behavior toward his wife admissible to prove intent in murder case), appeal dismissed, 289 Conn. 55, 956 A.2d 578 (2008), cert. denied, 555 U.S. 1216, 129 S. Ct. 1533, 173 L. Ed. 2d 663 (2009). Thus, it is significant that there was no direct evidence of any conviction arising from the Rose shooting, notwithstanding the defendant's statements to Finney acknowledging his exposure to imprisonment because of that shooting. See *State* v. *Henry*, 41 Conn. App. 169, 179, 674 A.2d 862 (1996) (noting that trial court properly admitted testimony of prior misconduct with respect to sexual assault, but limited testimony to fact of threat and sexual assault "without any additional details . . . [and] ruled that the jury would not be informed that the defendant had been convicted of and incarcerated for other crimes").

Second, we find significant the trial court's efforts to have the prosecution admonish its witnesses that any testimony about the Rose shooting was to be limited only to the fact that there was a shooting, with no other details regarding the events of that day. We also note that, at the request of the defendant, the trial court directed the redaction of references to assault charges on the evidence labels on the bags that held the five Rose shooting shell casings. These actions are significant because "the care with which the [trial] court weighed the evidence and devised measures for reducing its prejudicial effect militates against a finding of abuse of discretion." (Internal quotation marks omitted.) *State* v. *Beavers*, supra, 290 Conn. 406; see id. (noting that trial court excluded "most egregious and prejudicial uncharged misconduct . . . [including] the

defendant's comments about the financial benefits that would inure to his family from the death of his mother, the homicidal portion of his threat to [his former wife] in the early 1990s, and the prior arson conviction"); see also *State* v. *Blango*, 103 Conn. App. 100, 111, 927 A.2d 964 (relying on trial court's limitation of uncharged misconduct evidence only to defendant's display of same gun in separate incidents, without further detail, in case wherein victim alleged that defendant threatened her with gun to compel her to perform oral sex on him), cert. denied, 284 Conn. 919, 933 A.2d 721 (2007).

Third, we find significant in mitigating any possible prejudice the limiting instructions; see footnote 15 of this opinion; given by the trial court both during the testimony of relevant witnesses and during the final jury charge, which we presume the jury to have followed in the absence of any indication to the contrary. *State* v. *Beavers*, supra, 290 Conn. 407–408; see also, e.g., *State* v. *Cutler*, 293 Conn. 303, 314–15, 977 A.2d 209 (2009) (emphasizing repeated delivery of limiting instructions during trial and in final charge that uncharged misconduct evidence was limited solely to proving defendant's intent); *State* v. *Mooney*, supra, 218 Conn. 131 (trial court's balancing was not "abuse of discretion or injustice . . . especially in light of the limiting instruction given to the jury on this issue").

Finally, we find instructive decisions from numerous other federal and state courts that have rejected challenges, founded on undue prejudice, to the use of uncharged misconduct evidence in cases wherein the charged offenses were committed using the same gun that the defendant had utilized in prior shootings.[22] See

[22] We disagree with the defendant's extensive reliance on an Indiana decision, *Thompson* v. *State*, supra, 690 N.E.2d 224. First, *Thompson* is inapposite because it was not a case wherein the defendant had used the same gun to commit a previous crime, but rather, utilized evidence of the defendant's involvement in a prior shooting, during which he stole the murder weapon used in the crime charged. See id., 229 (noting that evidence of defendant's involvement in prior shooting was relevant "to prove an important element

*United States* v. *Higgs*, supra, 353 F.3d 312 (evidence of prior shooting with same gun was not unduly prejudicial because it "placed the murder weapon, which was disposed of in the Anacostia River and never found, in [the defendant's] hand a short time before the murders and, therefore, served the necessary function of proving his identity as one of the murderers and his use of the firearm in connection with the murders"); *State* v. *Williams*, 992 So. 2d 330, 334 (Fla. App. 2008) (admission of evidence of uncharged robberies, wherein eyewitness testimony had established defendant as perpetrator, not unduly prejudicial when ballistics evidence proved that "the identical weapon was used in all three of the armed robberies"); *People* v. *Brown*, 13 App. Div. 3d 145, 146, 786 N.Y.S.2d 55 (2004) (evidence of uncharged crime using same gun "was highly probative of [the] defendant's identity, and its probative value outweighed any potential for prejudice, which was minimized by the [trial] court's limiting instruction"), appeal denied, 4 N.Y.3d 828, 829 N.E.2d 676, 796 N.Y.S.2d 583 (2005); *State* v. *Lemons*, 348 N.C. 335, 352–53, 501 S.E.2d 309 (1998) (trial court's limiting instructions mitigated prejudicial effect of identity evidence of uncharged robberies using same gun, including testimony by shooting victim and photographs of that crime scene and victim's injuries), vacated on other grounds, 527 U.S. 1018, 119 S. Ct. 2363, 144 L. Ed. 2d 768 (1999); *State* v. *Stokes*, 381 S.C. 390, 406, 673 S.E.2d 434 (2009) (rejecting claim that uncharged misconduct evidence involving same gun, admitted to prove identity, was unduly prejudicial as offered to prove that defendant " 'might be a violent

of the [s]tate's case—that [the defendant] had access to the murder weapon before the killings"). Moreover, *Thompson* is distinguishable from the present case because the Indiana Supreme Court emphasized the sheer volume of unduly prejudicial evidence presented therein about the prior shooting, including the defendant's murder conviction for that shooting, and lengthy testimony recounting gruesome details of the "execution-style" nature of the prior shooting. Id., 234–36.

person who may possess a gun' ");[23] cf. *State* v. *Sharpe,* supra, 195 Conn. 659–60 (The court rejected the defendant's claim that "extensive testimony concerning the defendant's purchase of a pistol and his subsequent report of its theft just prior to the shooting" was irrelevant and unduly prejudicial because "evidence that the defendant had acquired the means of committing the crime was evidence that would logically tend to render more probable [the victim's] identification of the defendant as his assailant. It tended also to corroborate the other direct testimony that shell casings found at the scene of the shooting probably came from a gun of the type purchased by the defendant.").

Thus, we conclude that the Appellate Court improperly failed to defer to the trial court's balancing analysis in determining whether to admit evidence of the Rose shooting into evidence, as well as the trial court's efforts to minimize any undue prejudice that resulted from the admission of that uncharged misconduct evidence. It, therefore, ran afoul of our well established recognition of "the difficulties inherent in this balancing process . . . [which permits disturbance of] the trial court's decision . . . only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling."[24] (Internal quotation marks omitted.)

[23] The dissent contends that *United States* v. *Higgs,* supra, 353 F.3d 312, *State* v. *Williams,* supra, 992 So. 2d 334, *People* v. *Brown,* supra, 13 App. Div. 3d 146, and *State* v. *Stokes,* supra, 381 S.C. 406, are "inapposite" and provide "no support" for our conclusion herein because, in those cases, "the defendant had not acknowledged responsibility for the prior shooting . . . ." The dissent's reliance on this distinguishing factor is, however, overstated because none of the cited cases state that the defendant's failure to acknowledge responsibility for the prior shooting was even a factor in the court's analysis, let alone a controlling one.

[24] The dissent, like the Appellate Court, similarly fails to afford the trial court's evidentiary ruling proper deference, given the well established discretionary nature of the relevancy and prejudice determinations. See, e.g., *State* v. *Randolph,* supra, 284 Conn. 340. Giving the dissent the respect it is due,

*State* v. *Randolph*, supra, 284 Conn. 340. Moreover, we disagree with the Appellate Court's reliance, endorsed by the defendant, on *State* v. *Mortoro*, supra, 160 Conn. 378, and *State* v. *Dunbar*, supra, 51 Conn. App. 313, because those cases are inapposite since they did not involve evidence of prior misconduct in which the same weapon was utilized to commit the offenses charged.[25] Accordingly, we conclude that the Appellate Court improperly determined that the trial court had abused its discretion and that the defendant should receive a new trial in this case.

the applicable standard of review nevertheless dictates affirmance of the trial court's evidentiary ruling precisely because of the reasonable nature of our disagreement. See, e.g., *State* v. *Sanchez*, 69 Conn. App. 576, 594, 795 A.2d 597 (2002) ("If our standard of review were broader, we may very well conclude that the graphic nature of the second [autopsy] photograph [of the victim] was more prejudicial than its limited probative value supporting instantaneous death. Our standard of review is not broad, but rather is limited to whether the court clearly abused its discretion. The fact that we may be able to conclude that a photograph was not relevant does not mean that other reasonable persons might . . . conclude otherwise." [Internal quotation marks omitted.]). Indeed, "the abuse of discretion standard reflects the context specific nature of evidentiary rulings, which are made in the heat of battle by the trial judge, who is in a 'unique position' to '[observe] the context in which particular evidentiary issues arise and who is therefore in the best position to weigh the potential benefits and harms accompanying the admission of particular evidence. As a result, rules have been constructed to allow the trial judge some degree of choice in application of those rules.' D. Leonard, 'Power and Responsibility in Evidence Law,' 63 S. Cal. L. Rev. 937, 956–57 (1990) . . . ." (Citation omitted.) *State* v. *Saucier*, 283 Conn. 207, 238–39, 926 A.2d 633 (2007) (*Norcott, J.*, concurring in part).

[25] See *State* v. *Mortoro*, supra, 160 Conn. 389–90 (tape recording of defendant's conversation planning armed robbery was unduly prejudicial at his trial on charges of being accessory to narcotics sale because, to contradict defendant's claim that conversation never occurred, "it would have been quite sufficient for the state to have offered only the portion of the recording relating to the conversation concerning narcotics"); *State* v. *Dunbar*, supra, 51 Conn. App. 325–26 (concluding that trial court improperly refused to redact portion of police report noting that defendant had been arrested previous day for weapons charges because that "evidence painted the defendant as a recidivist who flouted the law by carrying a gun illegally only one day after his arrest on a similar charge," particularly because "the trial court gave no instructions to the jury as to how it could use the evidence").

## II

We next address the defendant's first alternative ground for affirming the judgment of the Appellate Court, namely, that the trial court violated his constitutional rights to due process and to present a defense by instructing the jury that "the ultimate issue before you is not the thoroughness of the investigation or the competence of the police" but, rather, whether the state "has proved beyond a reasonable doubt that the defendant is guilty on one or more of the counts for which he is charged." Before we consider the merits of this claim, which the defendant acknowledges that he failed to preserve by filing a written request to charge or taking an exception to the instruction as given, we first must determine, however, whether, in accordance with the defendant's request, it is reviewable pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We conclude that the defendant is entitled to *Golding* review of his claim, but also that the trial court's instruction did not violate his right to present a defense.

The record reveals the following additional relevant facts and procedural history. Prior to closing arguments, the trial court held a charge conference in chambers with all counsel. The defendant did not file a request to charge prior to the conference; the state filed a request to charge, but did not address therein the topic of the adequacy of the police investigation. The record and the parties' briefs do not indicate whether or when the trial court provided the parties with a copy of its draft charge in advance of the conference.

The following day, the trial court summarized on the record the proceedings at the charge conference, noting specifically, inter alia, that "the court will allow in final argument by the defendant concerning police competency in not following up on the fingerprint for . . .

Berrios; that it's limited to competency and not to be used in any way, shape or form for third party culpability. To make that more concrete, the court in reviewing the information with the jurors will indicate that there was no evidence of another participant in this crime." Neither the prosecutor nor the defendant had any further comment or objected to the trial court's summary of the charge conference.

In his closing argument, the defendant, inter alia, challenged the adequacy of the police investigation. In response, the state argued that, although the defendant had claimed that "the cops botched" this investigation, there was no evidence that it was inadequate. Thereafter, the trial court charged the jury: "Now, you have heard in the course of arguments by counsel discussion as to whether the police conducted a thorough investigation. You have also heard some discussion about the competency of the police in this arrest. Ladies and gentlemen, this question might be a matter of opinion, but the state has put its evidence before you and the defendant was entitled to make an investigation and put his evidence before you also. And, of course, not only the state but also the defense has put on evidence on behalf of the defendant.

*"I say to you, ladies and gentlemen, that the ultimate issue before you is not the thoroughness of the investigation or the competence of the police. The ultimate issue you have to . . . determine is whether the state in the light of all the evidence before you has proved beyond a reasonable doubt that the defendant is guilty on one or more of the counts for which he is charged."* (Emphasis added.) The defendant did not take any exceptions to this instruction at trial.

It is undisputed that this claim is unpreserved for appellate review and, therefore, unreviewable "unless the defendant is entitled to review under the plain error

doctrine or the rule set forth in *State* v. *Golding*, [supra, 213 Conn. 239–40]. . . . A party is obligated . . . affirmatively to request review under these doctrines." (Citation omitted; internal quotation marks omitted.) *State* v. *Cutler*, supra, 293 Conn. 324. Under *Golding*, however, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." *State* v. *Golding*, supra, 239–40.

A

We begin with the state's argument that the defendant waived his right to *Golding* review of his unpreserved jury instruction claim when his trial counsel consented to and expressed satisfaction with the instruction. The state's waiver claim requires us to apply the implicit waiver standard articulated recently in *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), wherein we concluded that, "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge

the instructions on direct appeal."[26] Id., 482–83. Noting that this waiver analysis is not a bright line rule, we emphasized that "a defendant will not be deemed to have waived [an instructional] claim unless the court has provided counsel with a copy of the proposed instructions and a *meaningful opportunity* for review and comment, which can be determined in any given case only by a close examination of the record. The significance of a meaningful opportunity for review and comment cannot be underestimated." (Emphasis in original.) Id., 495 n.28; see also id. ("[h]olding an on-the-record charge conference, and even providing counsel with an advance copy of the instructions, will not necessarily be sufficient in all cases to constitute waiver of *Golding* review if defense counsel has not been afforded adequate time, under the circumstances, to examine the instructions and to identify potential flaws").

In the present case, although the trial court conducted a charge conference during which counsel had an opportunity to participate in the formulation of the jury instructions, there is no indication on the record that the trial court provided the defendant with an advance copy of the proposed jury charge. Thus, although the trial court's summary of the conference

---

[26] In *Kitchens*, we noted that the defendant had twice declined to file a request to charge to be considered along with the state's request to charge, and the trial court subsequently held two charging conferences. *State* v. *Kitchens*, supra, 299 Conn. 498–99. At the first conference, the defendant raised issues not relevant to the claim on appeal, and then stated that he did not have other issues to discuss. Id., 499. At the second conference, held two days later, the defendant confirmed that he did not have "any major revisions" to the draft that the court had prepared. Id. Finally, neither the defendant nor the state took an exception to the charge as given. Id. We concluded, on that record, that the defendant's *Golding* claims with respect to the trial court's intent instructions were waived because "counsel had several meaningful opportunities to participate in fashioning the jury instructions and to review and object to any language contained therein because his counterpart, the prosecutor, repeatedly was able to make his own views known to the court." Id., 500.

indicates that one of the topics discussed—namely, closing arguments about the quality of the police investigation—related to the topic of the instructions now challenged on appeal, we cannot say with certainty whether the defendant had a meaningful opportunity to review the written instruction itself and to challenge any objectionable language therein. Thus, we decline to find this claim implicitly waived under *Kitchens*, and will review its merits pursuant to *Golding*.

### B

The defendant, relying primarily on *State* v. *Hernandez*, 218 Conn. 458, 590 A.2d 112 (1991), and a New York case, *People* v. *Rodriguez*, 141 App. Div. 2d 382, 529 N.Y.S.2d 318, appeal denied, 72 N.Y.2d 1049, 531 N.E.2d 668, 534 N.Y.S.2d 948 (1988), claims that the trial court's instruction with respect to the adequacy of the police investigation "destroyed [his] defense by precluding consideration of it and also by conveying the judge's impression that his defense was not worthy of consideration." In response, the state contends that this instruction previously has been upheld in, inter alia, *State* v. *Williams*, 169 Conn. 322, 363 A.2d 72 (1975), and *State* v. *Nieves*, 106 Conn. App. 40, 941 A.2d 358, cert. denied, 286 Conn. 922, 949 A.2d 482 (2008), and argues that it was a legally correct measure to keep the jury from being sidetracked with speculation, and did not foreclose the jury from considering the adequacy of the police investigation as it related to any weaknesses in the state's case against the defendant. We agree with the state and conclude that the challenged instructions did not deprive the defendant of his right to present a defense.

"[A] fundamental element of due process of law is the right of a defendant charged with a crime to establish a defense. . . . Where, as here, the challenged jury instructions involve a constitutional right, the applica-

ble standard of review is whether there is a reasonable possibility that the jury was misled in reaching its verdict. . . . In evaluating the particular charges at issue, we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law." (Internal quotation marks omitted.) *State* v. *Nathan J.*, 294 Conn. 243, 261, 982 A.2d 1067 (2009); see also *State* v. *Ash*, 231 Conn. 484, 493–94, 651 A.2d 247 (1994) ("[a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case" [internal quotation marks omitted]). "A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review." (Internal quotation marks omitted.) *State* v. *Singleton*, 292 Conn. 734, 746, 974 A.2d 679 (2009).

"In the abstract, whether the government conducted a thorough, professional investigation is not relevant to what the jury must decide: Did the defendant commit the alleged offense? Juries are not instructed to acquit the defendant if the government's investigation was superficial. Conducting a thorough, professional investigation is not an element of the government's case." (Internal quotation marks omitted.) *Morris* v. *Burnett*, 319 F.3d 1254, 1272 (10th Cir.), cert. denied, 540 U.S. 909, 124 S. Ct. 284, 157 L. Ed. 2d 198 (2003); see also id., 1273 (defendant must show that expert testimony about deficiencies in police investigation and interview of sexual abuse complainant relates to validity of charge against him). A defendant may, however, rely upon relevant deficiencies or lapses in the police investigation

to raise the specter of reasonable doubt, and the trial court violates his right to a fair trial by precluding the jury from considering evidence to that effect. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 485–86, 399 N.E.2d 482 (1980) (trial court improperly instructed jury not to consider evidence of investigators' failure to perform certain scientific tests when defendant's presentation at trial focused on raising inference that "police had contrived much of the case against him" and he emphasized that failure "in order to call into question the integrity of the police investigation"); see also *Commonwealth* v. *Avila*, 454 Mass. 744, 767, 912 N.E.2d 1014 (2009) ("a judge may not remove the issue of a biased or faulty police investigation from the jury");[27] *People* v. *Rodriguez*, supra, 141 App. Div. 2d 385 (trial court denied defendant fair trial by "eliminat[ing] from the jury's consideration an essential element of the defense," namely, police testing that did not yield fingerprints on gun at issue).

Again, the defendant challenges the trial court's instruction to the jury "that the ultimate issue before you is not the thoroughness of the investigation or the competence of the police. The ultimate issue you have to . . . determine is whether the state in the light of all the evidence before you has proved beyond a reasonable doubt that the defendant is guilty on one or more of the counts for which he is charged." We conclude that this instruction did not mislead the jury or violate the defendant's right to present a defense because it did not direct the jury not to consider the adequacy of

[27] Although trial courts may not remove the issue of the adequacy of the police investigation from the jury's consideration, in Massachusetts, the trial judge retains the discretion whether to give an instruction pursuant to *Commonwealth* v. *Bowden*, supra, 379 Mass. 472, "advising the jury that reasonable doubt as to the defendant's guilt could arise from a finding that law enforcement failed adequately to investigate the crime." (Citation omitted.) *Commonwealth* v. *Seng*, 456 Mass. 490, 501–502, 924 N.E.2d 285 (2010).

the investigation as it related to the strength of the state's case, or not to consider specific aspects of the defendant's theory of the case.[28] Rather, the instruction highlighted the portions of the parties' arguments that addressed the adequacy of the police investigation, and properly reminded the jury that its core task was to determine whether the defendant was guilty of the charged offenses in light of all the evidence admitted at trial, rather than to evaluate the adequacy of the police investigation in the abstract. See *State* v. *Williams*, supra, 169 Conn. 335–36 and n.3 (nearly identical instruction properly "left the jury free to decide the questions of fact");[29] cf. *Commonwealth* v. *Seng*, 456 Mass. 490, 502–503, 924 N.E.2d 285 (2010) (rejecting claim that trial court's instruction to jury not to speculate about nonexistent evidence because " 'this is real life and not [the television program "Crime Scene Investigation"]' " violated defendant's right to fair trial

[28] The defendant's reliance on *People* v. *Rodriguez*, supra, 141 App. Div. 2d 382, is, therefore, misplaced. In *Rodriguez*, the defendant, who had discarded a revolver while fleeing from the police, was convicted of criminal weapons possession. Id., 385. During summations, defense counsel had "stressed that, since no fingerprints were found on the recovered weapon, the officers could have been mistaken in claiming [that the] defendant had possession of a handgun," thus corroborating the defendant's testimony that he never possessed the gun. Id. The trial court then instructed the jury to " '[f]orget the fingerprints, because that's not what we are talking about here,' " and that " '[f]ingerprints have nothing to do with the issues in this case.' " Id. The Appellate Division concluded that this instruction violated the defendant's right to present a defense and a fair trial "in that it eliminated from the jury's consideration an essential element of the defense. In other words, the trial court all but told the jury not to consider [that] evidence." (Internal quotation marks omitted.) Id. *Rodriguez* is inapposite because the trial court in the present case did not instruct the jury not to consider the defendant's arguments or to reject his theory of the case but, rather, drew attention to the issue of the adequacy of the investigation while reminding the jury that the central issue in the trial was the defendant's guilt or innocence.

[29] See also *State* v. *Nieves*, supra, 106 Conn. App. 57–58 (nearly identical instruction did not dilute state's burden of proof or shift to defendant burden to raise reasonable doubt or prove his innocence); *State* v. *Tate*, 59 Conn. App. 282, 287–88, 755 A.2d 984 (same), cert. denied, 254 Conn. 935, 761 A.2d 757 (2000).

because it did not "asperse the defendant's argument" about adequacy of forensic investigation). Moreover, notwithstanding the defendant's arguments to the contrary, the trial court's instruction was phrased in neutral language and did not improperly disparage the defendant's claims, or improperly highlight or endorse the state's arguments and evidence. See *State* v. *Hernandez*, supra, 218 Conn. 463 ("a court must take care to avoid making improper remarks which are indicative of favor or condemnation . . . and must not indulge in an argumentative rehearsal of the claims of one side only" [citation omitted; internal quotation marks omitted]). Accordingly, we conclude that the defendant's claim fails under the third prong of *Golding* because the instruction did not violate his right to present a defense.

## III

Finally, we turn to the defendant's second alternative ground for affirming the judgment of the Appellate Court, namely, that the trial court failed to conduct a canvass that complied with the sixth amendment to the United States constitution,[30] as well as Practice Book § 44-3,[31] prior to permitting the defendant to represent

[30] "The sixth amendment to the United States constitution provides in relevant part: 'In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense.'

"The sixth amendment right to counsel is made applicable to state prosecutions through the due process clause of the fourteenth amendment. See *Gideon* v. *Wainwright*, 372 U.S. 335, 342, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963)." *State* v. *Diaz*, 274 Conn. 818, 828 n.9, 878 A.2d 1078 (2005).

[31] Practice Book § 44-3 provides: "A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

himself during portions of the trial. This claim is unpreserved and the defendant seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. Relying on, inter alia, *State* v. *T.R.D.*, 286 Conn. 191, 942 A.2d 1000 (2008), and *State* v. *Diaz*, 274 Conn. 818, 878 A.2d 1078 (2005), the defendant claims that his waiver of the right to counsel was not voluntary, knowing and intelligent because the canvass failed to: (1) "convey a realistic picture of what [he] faced if convicted because it did not give any range of punishment for the felony murder charge, it did not define 'life imprisonment' and it used a misleading example when explaining the concept of consecutive sentences," including the fact that his sentence in this case could be consecutive to his twenty-five year sentence from the Rose shooting; (2) "there is no evidence [the] defendant comprehended the nature of the charges or the proceedings, or that he knew of enough facts necessary for a broad understanding of the case, especially with regard to the new charges of felony murder and robbery"; and (3) the trial court did not advise the defendant of the dangers and disadvantages of self-representation. In response, the state contends that the trial court's canvass was proper and thorough, and the defendant's knowledge further was informed by his familiarity with the criminal justice system through two prior trials wherein he was represented by counsel, as well as his work with counsel in the present case. The state also emphasizes that any omission with respect to the definition of a life sentence only served in common parlance to *overstate* the length of the possible sentence, and that *Diaz* and *T.R.D.* are distinguishable because the canvass as a whole left the defendant with a meaningful understanding of the magnitude of his sentencing exposure. We agree with the state and conclude that the trial court's canvass of the defendant was constitutionally adequate.

"(4) Has been made aware of the dangers and disadvantages of self-representation."

The record reveals the following additional relevant facts and procedural history. On the first day of jury selection, the defendant's attorney advised the trial court that the defendant desired to represent himself. At that time, the trial court strongly advised the defendant against that decision, and to "take the benefit" of his appointed attorney. The defendant then elected to have his attorney represent him for purposes of selecting the jury on that day.

The next day of jury selection, the defendant's attorney advised the trial court that the defendant now desired to represent himself for the remainder of the trial, including jury selection, and already had filed a pro se appearance. After again strongly advising the defendant against representing himself,[32] the trial court proceeded to canvass the defendant:

"The Court: Okay. Well, let me go through some questions with you. Mr. Collins, how old are you, sir?

"[The Defendant]: Twenty-five.

"The Court: How far did you go in school?

"[The Defendant]: The [tenth grade].

"The Court: Until your incarceration were you employed, sir?

"[The Defendant]: Yes.

"The Court: And what . . . was your employment?

---

[32] The trial court stated to the defendant: "[M]y strongest recommendation is that you not [proceed pro se] because there's just so many things that happen during a trial that [the defendant's appointed attorney] as a competent defense counsel knows how to react to. And I suspect that perhaps you won't know and I cannot guide you. I have to hold you to the same level of competency in terms of . . . what's acceptable a question and what's not acceptable a question and I can't help you at all during the trial. Do you understand that, sir?

"[The Defendant]: Yes, sir."

"[The Defendant]: A nursing home.

"The Court: And how long had you been doing that, sir?

"[The Defendant]: Almost a year.

"The Court: Now have you ever been on trial before?

"[The Defendant]: Yes.

"The Court: Have you ever represented yourself before in any trial?

"[The Defendant]: No.

"The Court: Did you speak with your lawyer before you decided that you wanted to represent yourself?

"[The Defendant]: Yes.

"The Court: Do you understand the charges that you're facing, sir?

"[The Defendant]: Yes.

"The Court: The first charge is the charge of murder and the state would have to prove that you intended to cause the death of [Hopkins]. Do you understand that?

"[The Defendant]: Yes.

"The Court: And that if you're found guilty the minimum penalty would be twenty-five years and the maximum penalty would be life imprisonment just for that crime. Do you understand that, sir?

"[The Defendant]: Yes.

"The Court: And your second charge is that of . . . felony murder. And that . . . charge is that you acting alone or with someone else did commit the crime of robbery and in the furtherance of said crime or the flight therefrom did cause the death of [Hopkins]. Do you understand that?

"[The Defendant]: Yes.

"The Court: And that that also carries a very heavy penalty which could be ,. . . . consecutive to the first count. Do you understand that?

"[The Defendant]: Yes.

"The Court: Although there may be some double jeopardy issues on . . . that which in representing yourself you've got to bring up and I . . . again, I just don't know how . . . you're going to be able to do that. Maybe . . . you will be able to, but . . . there could be some double jeopardy issues with the second count and the first count. The third count is robbery in the first degree and that you stole certain property from [Hopkins] and in the course of the commission of that crime of stealing property from [Hopkins] you or another participant was armed with a deadly weapon to wit, a handgun. That if you're found guilty of that you could be given another twenty years. Do you understand that?

"[The Defendant]: Yes.

"The Court: And that that twenty years could be run consecutive to the prior counts. Do you understand that, sir?

"[The Defendant]: Yes.

"The Court: Now you understand what I mean by consecutive? It means I could put one at twenty-five years or forty years and add twenty years more for the robbery, sixty-five years. Do you understand that?

"[The Defendant]: Yes.

"The Court: Okay. And you still want to represent yourself, sir?

"[The Defendant]: Yes.

"The Court: Okay. Are you . . . familiar with the rules of procedure which govern criminal cases?

"[The Defendant]: Yes.

"The Court: Are you familiar with the rules of evidence which apply to criminal cases?

"[The Defendant]: Yes.

"The Court: Do you understand that the rules of evidence and the rules of procedure apply even when you're representing yourself without the assistance of counsel?

"[The Defendant]: Yes.

"The Court: Do you understand that I cannot give you any legal advice in conducting your defense?

"[The Defendant]: Yes.

"The Court: Do you understand that what you say and do during the trial can affect the outcome of an appeal or any postconviction remedy in the event you are found guilty?

"[The Defendant]: Yes.

"The Court: Do you understand that a competent trained attorney . . . possesses the skill and training to defend and protect your rights to assess the issues, to understand the strengths and weaknesses of the prosecution's case, to make appropriate objections to evidence, to preserve the record in the event of conviction for purposes of appeal and otherwise . . . [d]o you understand that, sir?

"[The Defendant]: Yes.

"The Court: Do you . . . feel that you also possess that kind of training and experience and skill?

"[The Defendant]: Yes.

"The Court: Do you understand that as a lay person you'd be at a significant disadvantage and face obvious dangers in representing yourself?

"[The Defendant]: Yes.

"The Court: Do you understand that you have a right to counsel under the federal and state constitution[s]? Do you understand that, sir?

"[The Defendant]: Yes.

"The Court: And that you have the right to have an attorney represent you if you are unable to afford an attorney? Do you understand that, sir?

"[The Defendant]: Yes.

"The Court: Do you have any questions about your representation of yourself?

"[The Defendant]: No."

The court then found that "the defendant in answering the questions of the court appears competent to waive counsel and that his waiver is knowingly and intelligently and voluntarily made."[33] The trial court then appointed the defendant's former attorney to serve

---

[33] Following a brief recess, the trial court elaborated further on its findings, stating: "Based on the answers that [the defendant] gave me to the questions . . . I'm satisfied that he has been clearly advised of his right to have counsel. That he has the intelligence and capacity to appreciate the consequences of the action that he has decided to represent himself. That he comprehends the nature of the charges, the range of permissible punishment and any other additional facts essential to a broad understanding of the crime. I . . . don't think I mentioned on the robbery, the twenty years. There's five years on that subsection are nonsuspendable or nonmodifiable and [he] has been made aware of the dangers and disadvantages of self-representation. He decided that he wants to do this himself. I'm going to also order that his leg shackles be taken off and that [the prosecutor] and [the defendant] will both address the panel from in back of their desk. Okay, Mr. Collins, when you ask your questions you'll be in back of the desk. [The prosecutor] will be . . . ordered to do the same thing."

as his standby counsel; see Practice Book §§ 44-4[34] and 44-5;[35] and confirmed the defendant's understanding that standby counsel would be present to assist him if requested.[36] The trial court then explained to the defendant the jury selection process, as well as the necessity of following the rules of courtroom practice, and informed him again: "I'm not sure this is a good decision you've made. You have the right to make it and you have the right for self-representation as long as you're not disruptive in court [because] then you can lose that right. I can have you removed from the court and continue the trial without you. But I . . . fear that, you know, you'll . . . look back if things don't go well and say, boy, you know, maybe I shouldn't have done that. But . . . it's your choice and if you feel strongly enough about it, you certainly have the right to do it. There are just such significant advantages to you because, you know, we have rules. Rules of evidence, rules of procedure and . . . I'll be enforcing them upon you to the same extent that I'll be enforcing them on

[34] Practice Book § 44-4 provides: "When a defendant has been permitted to proceed without the assistance of counsel, the judicial authority may appoint standby counsel, especially in cases expected to be long or complicated or in which there are multiple defendants. A public defender or special public defender may be appointed as standby counsel only if the defendant is indigent and qualifies for appointment of counsel under General Statutes § 51-296, except that in extraordinary circumstances the judicial authority, in its discretion, may appoint a special public defender for a defendant who is not indigent."

[35] Practice Book § 44-5 provides: "If requested to do so by the defendant, the standby counsel shall advise the defendant as to legal and procedural matters. If there is no objection by the defendant, such counsel may also call the judicial authority's attention to matters favorable to the defendant. Such counsel shall not interfere with the defendant's presentation of the case and may give advice only upon request."

[36] The trial court advised the defendant that he "can go to [standby counsel] for advice if you want. He will not offer advice to the court unless you want him to. And he—if you want him to, he can . . . make available to the court information that is favorable to you as it comes out to him in the trial. But this is not [dual] representation. It's not both of you. It's you and he is standby counsel."

[the prosecutor]. So if this is what you want to do, we'll . . . let you do it, but . . . I feel very strongly that it's not in your best interests. But that's . . . your call, sir. We'll have a short recess so that we can bring down the jury panel and then we'll start jury selection." The defendant then represented himself for the remainder of jury selection[37] until the first day of evidence, after the testimony of the first responding Bridgeport police officer, and the direct examination testimony of Gallagher, a detective. Standby counsel then represented the defendant for the remainder of the trial, commencing with the cross-examination of Gallagher.

We begin by noting that we agree with the defendant that this unpreserved claim is reviewable pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, because, under the first two prongs of *Golding*, the record is adequate for review and the claim is of constitutional dimension. We conclude, however, that the defendant's claim fails under the third prong of *Golding* because the trial court's thorough canvass of the defendant protected his sixth amendment right to counsel.

"We begin with the applicable standard of review. We review the trial court's determination with respect to whether the defendant knowingly and voluntarily elected to proceed pro se for abuse of discretion. . . . Recognizing the constitutional implications attendant to *Golding* review, we do not review the proceedings for strict compliance with the prophylactic rule of Practice Book § 44-3, but rather for evidence that the waiver of counsel was made knowledgeably and voluntarily. . . .

---

[37] The state notes that the defendant took numerous legal actions during this time, including asserting a challenge to a potential juror pursuant to *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and moving to dismiss the charges on the ground that the statute under which he was charged lacked an enabling clause.

"The right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. . . . Put another way, a defendant properly exercises his right to self-representation by knowingly and intelligently waiving his right to representation by counsel. . . .

"Practice Book § [44-3] was adopted in order to implement the right of a defendant in a criminal case to act as his own attorney . . . . Before a trial court may accept a defendant's waiver of counsel, it must conduct an inquiry in accordance with § [44-3], in order to satisfy itself that the defendant's decision to waive counsel is knowingly and intelligently made. . . . Because the § [44-3] inquiry simultaneously triggers the constitutional right of a defendant to represent himself and enables the waiver of the constitutional right of a defendant to counsel, the provisions of § [44-3] cannot be construed to require anything more than is constitutionally mandated. . . .

"[A] defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation . . . . Rather, a record that affirmatively shows that [he] was literate, competent, and understanding, and that he was voluntarily exercising his informed free will sufficiently supports a waiver. . . . The nature of the inquiry that must be conducted to substantiate an effective waiver has been explicitly articulated in decisions by various federal courts of appeals. . . .

"None of these authorities, however, stands for the proposition that a defendant must be specifically

informed of the particular elements of the crimes charged before being permitted to waive counsel and proceed pro se. . . . [P]erfect comprehension of each element of a criminal charge does not appear to be necessary to a finding of a knowing and intelligent waiver. . . . A discussion of the elements of the charged crimes would be helpful, and may be one of the factors involved in the ultimate determination of whether the defendant understands the nature of the charges against him. A description of the elements of the crime is not, however, a sine qua non of the defendant's constitutional rights in this context. Indeed, in our cases we have approved of a defendant's assertion of the right to proceed pro se in a case in which the record did not affirmatively disclose that the trial court explained the specific elements of the crimes charged to the defendant as long as the defendant understood the nature of the crimes charged. . . .

"The multifactor analysis of [Practice Book § 44-3], therefore, is designed to assist the court in answering two fundamental questions: first, whether a criminal defendant is minimally competent to make the decision to waive counsel, and second, whether the defendant actually made that decision in a knowing, voluntary and intelligent fashion. . . . As the United States Supreme Court recently recognized, these two questions are separate, with the former logically antecedent to the latter. . . . Inasmuch as the defendant's competence is uncontested, we proceed to whether the trial court abused its discretion in concluding that the defendant made the waiver decision in a knowing, voluntary, and intelligent fashion." (Citations omitted; internal quotation marks omitted.) *State* v. *D'Antonio*, 274 Conn. 658, 709–12, 877 A.2d 696 (2005).

We conclude that the trial court's extensive canvass of the defendant prior to his election to proceed pro se was a model canvass that afforded him the constitu-

tional protections to which he was entitled. The trial court clearly advised the defendant multiple times of his right to assigned counsel, and urged him to exercise that right in light of the dangers of self-representation, including cautions that he would be held responsible for complying with all applicable procedural and evidentiary rules,[38] and that his actions during the trial could adversely affect subsequent appellate or postconviction remedies. The trial court then reminded the defendant that a trained attorney would have the requisite skill and training to better protect his rights while trying his case. Thus, in canvassing the defendant, the trial court satisfied its critical responsibility of cautioning the defendant about the potentially disastrous consequences of electing to proceed pro se. *State* v. *Webb*, 238 Conn. 389, 430, 680 A.2d 147 (1996); see also *State* v. *Frye*, 224 Conn. 253, 261, 617 A.2d 1382 (1992) ("the trial court must fulfill its duty to explain the problems of self-representation to a person not trained in the law"); *United States* v. *Fore*, 169 F.3d 104, 109 (2d Cir.) (District Court properly advised defendant that "a choice to proceed pro se was devastating and entailed near-certain conviction"), cert. denied, 527 U.S. 1028, 119 S. Ct. 2380, 144 L. Ed. 2d 783 (1999).

Moreover, we disagree with the defendant's contention that the canvass did not inform him adequately of his sentencing exposure, since he mistakenly could

---

[38] We disagree with the defendant's claim that, under *State* v. *Frye*, 224 Conn. 253, 261, 617 A.2d 1382 (1992), the canvass was deficient because the trial court did not "explain [that] it was vital that [the] defendant know how to cross-examine witnesses and especially know about the rules regarding prior inconsistent statements," given the fact that this case already had been tried once. *Frye* is distinguishable because, in that case, there was virtually no canvass at all because the trial court ostensibly, and improperly, concluded that one was not required prior to permitting the defendant to undertake hybrid representation. See id., 255–57; see also id., 261 (noting that "the trial court was not obligated to point out in painful detail the legal arguments subsumed within this strategic decision" of "whether to present evidence of drug dependency").

have concluded that " 'life imprisonment' was in the range of forty to forty-five years, and not sixty years." It is well settled that, in canvassing a defendant seeking to exercise his right of self-representation, a trial court must apprise him of the possible range of criminal penalties or punishments to which he is exposed. See, e.g., *State* v. *D'Antonio*, supra, 274 Conn. 711. Put differently, a constitutionally valid canvass is one that leaves the defendant with a "meaningful appreciation of the period of incarceration he face[s] if convicted of the charges he face[s]." *State* v. *T.R.D.*, supra, 286 Conn. 206. That explanation need not be made with mathematical exactitude, so long as it leaves the defendant with a "realistic picture" of his sentencing exposure. *United States* v. *Fore*, supra, 169 F.3d 108; see id. (declining to require trial judge to "inform defendant about a hypothetical 125-year prison sentence" when ten year sentence that court explained was consistent with sentencing guidelines and his actual sentence was only twenty-seven months); see also id. ("detailed discussion of every allowable component of a potential punishment could detract from the trial court's duty to inform defendant of the effect that self-representation could have upon his imminent trial, his rights and defenses"); *State* v. *Gaston*, 86 Conn. App. 218, 233–34, 860 A.2d 1253 (2004) (trial court's warning that consecutive sentencing could cause defendant to spend rest of life in prison was adequate explanation of range of potential penalties), cert. denied, 273 Conn. 901, 867 A.2d 840 (2005); *State* v. *Porter*, 76 Conn. App. 477, 501–502, 819 A.2d 909 (noting that "[t]he rules of practice do not . . . require the court to satisfy itself that the defendant has a *precise* understanding of the maximum sentence" and concluding that failure to explain additional exposure period of twenty-one months did not render canvass improper when trial court had made defendant aware of twenty-three year exposure period [emphasis in original]), cert. denied, 264 Conn. 910, 826 A.2d 181 (2003).

In our view, there is no doubt that the trial court's canvass adequately conveyed to the defendant the gravity of the significant sentencing exposure that he faced, including that, if he were to be convicted of either murder or felony murder, the trial court could impose a minimum twenty-five year sentence, and then add on a consecutive sentence of twenty years for the robbery count. Put differently, it is clear from the context of the entire canvass that the trial court's mention of possible twenty-five or forty year sentences on the murder counts, in addition to a twenty year exposure on the robbery count, were illustrative of the gravity of possible sentences faced by the defendant, and plainly were not a cap on his exposure. Although the canvass did not specifically define the meaning of the legal term "life imprisonment," that omission is rendered inconsequential by virtue of the fact that the common understanding of the term "life" in the context of imprisonment, namely, "a sentence of imprisonment for the remainder of a convict's life"; Merriam-Webster's Collegiate Dictionary (10th Ed. 1993); is even more grave than the statutory definition of life imprisonment, which provides for a "definite sentence of sixty years . . . ."[39] General Statutes § 53a-35b.[40]

[39] Thus, we disagree with the defendant's reliance on *State* v. *Diaz*, supra, 274 Conn. 832, wherein we concluded that a canvass was inadequate because, despite the trial court's reference to "the charges pending against the defendant as 'very substantial' and to the defendant's cases as 'big prison time cases,' those comments provided no real guidance to the defendant with respect to the actual prison time to which he was exposed," namely, fifty years, particularly in juxtaposition to the offered plea bargain of fifteen years. In so concluding, we noted that "[s]uch terms may have some utility in aiding the court to convey the serious consequences faced by a defendant who expresses a desire to proceed pro se, but, standing alone, they are far too nebulous and imprecise to satisfy the constitutional requirement that a defendant be advised of the range of permissible punishments." Id., 832; accord *State* v. *T.R.D.*, supra, 286 Conn. 199, 205–206 (deficient canvass did not reveal any explanation of potential one to five year exposure).

[40] General Statutes § 53a-35b provides: "A sentence of imprisonment for life shall mean a definite sentence of sixty years, unless the sentence is life imprisonment without the possibility of release, imposed pursuant to

Moreover, we also disagree with the defendant's argument that the trial court's failure to explain the sentencing options for felony murder by itself rendered the canvass inadequate. Because felony murder is simply an alternative method of committing murder; see *State v. Cator*, 256 Conn. 785, 803–804, 781 A.2d 285 (2001); and is subject to the same sentencing provision; see General Statutes § 53a-35a;[41] the trial court's canvass did not leave the defendant ill-informed or in any way fail to convey to the defendant the risk that he faced the rest of his natural life behind bars in the event of conviction.

We further reject the defendant's characterization of the canvass, particularly with respect to its explanation of the robbery and felony murder charges, and the dangers inherent in self-representation, as in any way perfunctory. The trial court engaged in a detailed explanation of the information and the allegations therein that related to the elements of the charges. The defendant did not express any confusion or request any further explanation of the charges at any point, and at all times indicated his understanding of the trial court's repeated statements that representing himself in this criminal trial was indeed a poor idea. Thus, he cannot rely on Practice Book § 44-3 to "protect [himself] from his poor judgment in failing to heed the court's warning that representing oneself is something most people consider a bad idea"; *State v. Caracoglia*, 95 Conn. App. 95, 114, 895 A.2d 810, cert. denied, 278 Conn. 922, 901 A.2d 1222 (2006); especially in light of his ample prior

subsection (g) of section 53a-46a, in which case the sentence shall be imprisonment for the remainder of the defendant's natural life."

[41] General Statutes § 53a-35a provides in relevant part: "For any felony committed on or after July 1, 1981, the sentence of imprisonment shall be a definite sentence and the term shall be fixed by the court as follows: (1) For a capital felony, a term of life imprisonment without the possibility of release unless a sentence of death is imposed in accordance with section 53a-46a; (2) for the class A felony of murder, a term not less than twenty-five years nor more than life . . . ."

experience with the criminal justice system, including two trials at which he was represented by counsel—namely, the Rose shooting trial, and his first trial and all pretrial proceedings in this case—given that there is no indication that he lacked the opportunity to communicate with his counsel. Thus, the trial court could "appropriately presume that defense counsel . . . explained the nature of the offense in sufficient detail." *State* v. *Gethers*, 193 Conn. 526, 537, 480 A.2d 435 (1984); cf. *State* v. *Diaz*, supra, 274 Conn. 832 n.14 (concluding that "the record does not support a presumption that the defendant had been apprised by counsel of the range of possible penalties that he faced if convicted" because "the defendant was represented by counsel only briefly and never, insofar as the record reflects, in connection with the narcotics charges except for bond purposes only"); *State* v. *Frye*, supra, 224 Conn. 262 (noting defendant's expressed dissatisfaction with his attorney's level of preparation and fact that they had talked " 'no more than [twenty] minutes at the most' ").

Thus, we cannot conclude that the trial court abused its discretion in determining that the defendant's waiver of his right to counsel was knowing, intelligent and voluntary. The record plainly indicates that the defendant "kn[ew] what he [was] doing and his choice [was] made with eyes open." (Internal quotation marks omitted.) *Faretta* v. *California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion KATZ, VERTEFEUILLE, ZARELLA and McLACHLAN, Js., concurred.

PALMER, J., dissenting. I disagree with the majority's conclusion that, contrary to the determination of the

Appellate Court, the defendant, Ricardo Collins, is not entitled to a new trial due to the improper admission of highly prejudicial evidence. Specifically, I believe that the Appellate Court properly determined that the trial court committed harmful error when it permitted the state to introduce testimony establishing that the defendant had shot Stephen Rose in an incident that occurred three months prior to the shooting of the victim in the present case, namely, Calvin Hopkins.[1] Although it is undisputed that the state was entitled to prove the defendant's possession of the gun that had been used in the Rose shooting, under the circumstances presented, the state had no legitimate reason to adduce evidence that the defendant actually had used that gun to shoot Rose. Furthermore, evidence of the Rose shooting was not relevant for any other purpose. Because I also agree with the Appellate Court that the trial court's improper admission of the evidence concerning the Rose shooting deprived the defendant of a fair trial, I respectfully dissent.[2]

I begin with a brief summary of the relevant facts and procedural history. Following a verbal dispute with Rose on August 28, 2002, the defendant removed a nine millimeter handgun from his waistband and fired four shots into the pavement near where Rose was standing. The altercation became physical and, during the ensuing scuffle, the defendant fired a fifth shot that struck Rose and lodged in his upper arm. Five shell casings from the defendant's gun were recovered at the scene.

[1] The Appellate Court concluded that evidence of the Rose shooting was inadmissible because the minimal probative value of that evidence was far outweighed by the danger of unfair prejudice. See *State* v. *Collins*, 111 Conn. App. 730, 732, 743, 961 A.2d 986 (2008). As I explain more fully hereinafter, that evidence also may be viewed as lacking any probative value because it was wholly irrelevant to any contested issue in the case. In either event, however, the evidence was inadmissible.

[2] Because I would affirm the judgment of the Appellate Court, I need not address the defendant's alternative grounds for affirmance.

Thereafter, on December 2, 2002, in the city of Bridge-
port, Hopkins was fatally shot in the head by a person
wielding a nine millimeter handgun. The police
retrieved a shell casing from that shooting that had
lodged on Hopkins' collar, but the police were unable
to solve that murder in the weeks immediately following
the shooting.

In January, 2003, the defendant contacted the Bridge-
port police and confessed to the shooting involving
Rose but claimed that he had acted in self-defense. The
defendant also told the police that he had sold the gun
shortly after that shooting to an unknown person for
$300. During the course of his interview with the police,
the defendant also was questioned about the Hopkins
murder. The defendant admitted that he had been with
Hopkins in Hopkins' car on the night of December 2,
2002, for the purpose of purchasing drugs but denied
any involvement in the Hopkins murder. Thereafter,
ballistics testing on the shell casing recovered from
Hopkins' collar and similar testing on shell casings
recovered from the scene of the Rose shooting estab-
lished that the bullets used in each of those incidents
had been fired from the same nine millimeter handgun.

The defendant ultimately was convicted of offenses
arising out of the Rose shooting and also was arrested
and tried for the murder of Hopkins. At the defendant's
first trial in the Hopkins case, the state introduced evi-
dence establishing that the defendant had shot Rose
for the purpose of demonstrating that the defendant
had used the same gun in connection with the Hopkins
murder. In that initial trial, however, the jury ultimately
reported that it was hopelessly deadlocked, and the
trial court declared a mistrial. Thereafter, the defendant
was tried a second time for the Hopkins murder.[3] At

---

[3] At the second trial, the defendant faced charges of murder, felony murder
and robbery in the first degree.

that trial, the state again sought to introduce evidence of the defendant's involvement in the Rose shooting. The defendant, who at the time was representing himself, objected to that evidence, claiming that any testimony concerning the fact that he had shot Rose would be "highly prejudicial" and that such prejudice "clearly outweigh[ed]" any possible probative value. The defendant further maintained that the state had no need to present that evidence for the purpose of linking him to the gun that had been used in the Rose shooting because the defendant already had acknowledged possessing that gun when he confessed to shooting Rose.[4]

The trial court overruled the defendant's objection, concluding that the evidence was relevant under § 4-5 of the Connecticut Code of Evidence[5] to prove intent, an element of a crime, and opportunity. The court also concluded that the probative value of the evidence outweighed any danger of unfair prejudice under § 4-3 of the Connecticut Code of Evidence.[6] The trial court,

[4] During the same colloquy in which the defendant himself raised an objection to the state's use of any evidence that he had shot Rose, the defendant's standby counsel also spoke in support of that objection. In those remarks, standby counsel indicated that the state properly could introduce evidence identifying the defendant as the person who fired those shots but that it would be improper for the state also to present evidence establishing that one of those shots had struck and injured Rose.

[5] Section 4-5 of the Connecticut Code of Evidence provides in relevant part: "(a) Evidence of other crimes, wrongs or acts inadmissible to prove character. Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person.

"(b) When evidence of other crimes, wrongs or acts is admissible. Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony. . . ."

[6] Section 4-3 of the Connecticut Code of Evidence provides: "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."

however, gave the jury a limiting instruction with respect to the proper use of the evidence.[7] Although Rose did not testify, the state adduced evidence concerning the Rose shooting through several other witnesses, including an expert firearms examiner who testified that the same gun was used to fire the bullets in both the Rose shooting and the Hopkins murder. After the state adduced evidence that the defendant had shot Rose, the defendant consented to the state's introduction of the statement that he had given to the police in which he acknowledged that he had shot Rose but claimed that he did so in self-defense. In that statement, the defendant also claimed that he had sold the gun used in the Rose shooting shortly after that incident.

Following the court's instructions, the jury commenced its deliberations, during which the jury twice communicated to the court that it could not reach a unanimous verdict as to one of the counts of the information. On both such occasions, the court instructed the jury to continue deliberating, and, on the second occasion, the court gave the jury a Chip Smith instruction.[8] The jury subsequently found the defendant guilty as charged.

---

[7] I note that the limiting instruction that the trial court actually gave to the jury does not mirror precisely the reasons that the court initially offered in support of its conclusion that the evidence was relevant. In particular, the court instructed the jury that "[t]he limited purposes [for which the jury could consider the evidence were] on the issues of intent, element of a crime or opportunity." The court also expressly instructed the jury that it could not consider the evidence that the defendant had shot Rose as "evidence of any bad character of the defendant" or as "evidence [of] a tendency on his part to commit criminal acts."

[8] "The purpose of the [Chip Smith] instruction is to prevent a hung jury by urging the jurors to attempt to reach agreement. It is a settled part of Connecticut jurisprudence . . . . Better than any other statement . . . it makes clear the necessity, on the one hand, of unanimity among the jurors in any verdict, and on the other hand the duty of careful consideration by each juror of the views and opinions of each of his fellow jurors . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *O'Neil*, 261 Conn. 49, 60, 801 A.2d 730 (2002).

On appeal to the Appellate Court, the defendant claimed, inter alia, that the trial court improperly had allowed the state to introduce evidence establishing that he had shot Rose and that the state's use of that evidence had deprived him of a fair trial. *State* v. *Collins*, 111 Conn. App. 730, 737, 961 A.2d 986 (2008). He asserted, specifically, "that the probative value of evidence that he had shot and injured Rose did not overcome the risk of prejudice to his defense, even with the limiting instruction given by the court. He further assert[ed] that although it may have been probative that he once owned a gun that produced shell casings that match the one found on Hopkins' collar, the fact that he shot Rose with that gun was irrelevant to proving anything for which such evidence would be admissible." Id. The state maintained that the entirety of the Rose evidence, including the fact that the defendant had shot Rose, was relevant to prove identity and motive.[9]

After setting forth the principles of §§ 4-3 and 4-5 of the Connecticut Code of Evidence, the Appellate Court expressed its agreement with the defendant, explaining: "The testimony relating to the Rose [shooting] clearly fits into the category of evidence that would have unduly aroused the [jurors'] emotions and hostilit[ies]. It painted the defendant as a gun toting criminal with a proclivity for shooting people. The evidence was not admissible for that purpose. See [Conn. Code Evid. § 4-5]. . . .

"The testimony of several individuals was introduced at trial regarding the Rose shooting. The portion of the testimony relevant to the crimes for which the defen-

[9] On appeal to the Appellate Court, the state contended that the defendant's responsibility for the Rose shooting was relevant to establish a motive for the Hopkins murder, namely, that the defendant had been on the run and unemployed since the Rose shooting, and had resorted to robberies, including the robbery of Hopkins, to support himself. The state raised this claimed ground of admissibility for the first time on appeal to the Appellate Court.

dant was on trial was simply that which would prove that he had at some time owned a gun that produces shell casings that match the one found on Hopkins' collar. It would have been sufficient for the state simply to introduce evidence to that effect without going into the details of the defendant's involvement with the [shooting of] Rose." (Citation omitted.) *State* v. *Collins*, supra, 111 Conn. App. 743. After concluding that "the danger of unfair prejudice resulting from the admission of that evidence far outweighed its probative value"; id., 732; the Appellate Court also concluded that the defendant had satisfied his burden of demonstrating that the impropriety was harmful and that he therefore was entitled to a new trial.[10] Id., 744.

On appeal to this court following our granting of certification, the state claims that the Appellate Court improperly concluded that the evidence that proved that the defendant had shot Rose was inadmissible. In particular, the state contends that the evidence was relevant to establish identity and motive and, in addition, to corroborate the testimony of Kimberly Finney, an inmate whom the defendant allegedly had confided in about his involvement in the Rose shooting and the

_____

[10] In explaining that "[t]he portion of the testimony relevant to the crimes for which the defendant was on trial was simply that which would prove that he had at some time owned a gun that produces shell casings that match the one found on Hopkins' collar"; *State* v. *Collins*, supra, 111 Conn. App. 743; the Appellate Court seemed to be suggesting that evidence of the shooting itself was irrelevant. The Appellate Court, however, repeatedly stated that the prejudicial effect of that evidence outweighed its probative value. See id., 732 ("the danger of unfair prejudice resulting from the admission of [the] evidence [of the Rose shooting] far outweighed its probative value"); id., 743 ("the testimony [concerning the Rose shooting] would have unduly prejudiced the jury, while its probative value was minimal"). These statements by the Appellate Court concerning the minimal probative value of the evidence concerning the Rose shooting, coupled with the court's reliance on the balancing standard of § 4-3 of the Connecticut Code of Evidence, reflect the court's view that the evidence, although minimally probative, was inadmissible because of the danger of unfair prejudice that it posed to the defendant.

Hopkins murder while the two men were incarcerated together at the Bridgeport correctional center. The state further maintains that, contrary to the conclusion of the Appellate Court, the trial court reasonably determined that the probative value of the evidence establishing that the defendant had shot Rose outweighed its potential for unfair prejudice. The defendant contends that the Appellate Court correctly concluded that the prejudicial effect of the evidence outweighed its minimal probative value. Alternatively, the defendant asserts that evidence of the Rose shooting was irrelevant and, therefore, inadmissible. In either case, the defendant claims that the trial court's admission of the evidence was harmful and that a new trial therefore is required.

In resolving the issue presented by this appeal, the majority states as follows: "The Appellate Court's decision did not address the first prong of the uncharged misconduct inquiry [under § 4-5 (b) of the Connecticut Code of Evidence], appearing to assume, but without specifically indicating, that the trial court properly had determined that evidence that the defendant had shot Rose with the same [gun] that was used to murder Hopkins was relevant under either of the corroboration or identity exceptions set forth in § 4-5 (b) . . . ."[11]

---

[11] I note that, although the trial court expressly instructed the jury that evidence of the Rose shooting was relevant only for the purpose of proving intent, an element of a crime, or opportunity, the majority asserts that the Appellate Court "appear[s] to [have] assume[d]" that the evidence "was relevant under either of the corroboration or identity exceptions" of § 4-5 (b) of the Connecticut Code of Evidence. It is true that, in a colloquy with counsel concerning the admissibility of the evidence, the trial court did state that the evidence was relevant to prove identity and to corroborate testimony, as well as for other purposes. Thereafter, however, in its instructions to the jury, the court expressly limited the jury's consideration of the evidence "to the issues of intent, element of a crime or opportunity." In view of the fact that the trial court informed the jury that the evidence was relevant as to those issues and those issues only, I see no reason to presume, as the majority does, that the Appellate Court assumed that the evidence was relevant for other purposes, such as corroboration or to prove identity.

Rather, the Appellate Court's analysis focused on the second prong of the test [under § 4-3 of the Connecticut Code of Evidence], and the defendant's claim 'that the probative value of evidence of the Rose shooting did not overcome the risk of prejudice, even with the limiting instruction given by the court. He further asserts that although it may have been probative that he once owned a gun that produced shell casings that match the shell casing found on Hopkins' collar, the fact that he shot Rose with that gun was not necessary to prove any element of the state's case.' *State* v. *Collins*, supra, 111 Conn. App. 742." The majority then proceeds to explain why, in its view, "the Appellate Court improperly determined that the trial court had abused its discretion in determining that the prejudicial effect of the evidence that the defendant had shot Rose with the same gun used in Hopkins' murder did not unduly exceed its probative value." In doing so, the majority rejects the defendant's threshold contention that the evidence was irrelevant and therefore inadmissible, concluding that the evidence "was relevant to prove the defendant's identity as the shooter in this case, as well as to corroborate Finney's testimony to that effect." Footnote 19 of the majority opinion.

As I explain more fully hereinafter, the trial court improperly permitted the state to present evidence of the Rose shooting because that evidence was not relevant to prove any fact at issue in the case. Even if that evidence may be deemed relevant, however, it was inadmissible because, as the Appellate Court explained, any minimal probative value that it may have had was far outweighed by its potential for unfair prejudice. Furthermore, whether the evidence is viewed as irrelevant or minimally relevant, the state's use of that evidence entitles the defendant to a new trial because it was so prejudicial as to violate the defendant's due process right to a fair trial.

Before addressing the majority's conclusion that the trial court properly permitted the state to present evidence of the Rose shooting, I first note the firmly established principles of relevance and materiality that govern a review of that conclusion. Except as provided by the state and federal constitutions, state statute or the Connecticut Code of Evidence, "[a]ll relevant evidence is admissible . . . . Evidence that is not relevant is inadmissible." Conn. Code Evid. § 4-2. "Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." (Internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 635, 1 A.3d 1051 (2010). Thus, "[e]vidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, [as] long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Bonner*, 290 Conn. 468, 497, 964 A.2d 73 (2009). As this court previously has noted, "[e]vidence is admissible only to prove material facts, that is to say, those facts directly in issue or those probative of matters in issue; evidence offered to prove other facts is immaterial." (Internal quotation marks omitted.) *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 265 Conn. 79, 106, 828 A.2d 31 (2003). With respect to the issue of materiality, "[e]vidence is immaterial if the objector is tempted to respond 'so what,' 'who cares,' or 'that is not in issue.' " C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 4.1.3, p. 136.

Furthermore, "[e]vidence of a defendant's uncharged misconduct is inadmissible to prove that the defendant committed the charged crime or to show the predisposition of the defendant to commit the charged crime. . . . Exceptions to this rule have been recognized, however, to render misconduct evidence admissible if, for

example, the evidence is offered to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . . Since the admission of uncharged misconduct evidence is a decision within the discretion of the trial court, we will draw every reasonable presumption in favor of the trial court's ruling. . . . We will reverse a trial court's decision only when it has abused its discretion or an injustice has occurred." (Internal quotation marks omitted.) *State* v. *Cutler*, 293 Conn. 303, 311–12, 977 A.2d 209 (2009).

As I have indicated, the defendant does not dispute the fact that his possession of the gun used in the Rose shooting is relevant to the issue of whether he shot and murdered Hopkins. Indeed, in light of the state's evidence indicating that the same gun was used in both shootings, it is inarguable that the state had a legitimate interest in linking the defendant to the gun used in the Rose shooting because proof of that connection also implicates the defendant in the Hopkins murder.[12] The issue presented by this appeal, however, is not whether the trial court properly permitted the state to adduce evidence concerning the defendant's prior possession of the gun at the time of the Rose shooting but, rather, whether the court properly overruled the defendant's

[12] In essence, evidence demonstrating the defendant's prior possession of the murder weapon is relevant to establish identity insofar as that evidence tends to identify the defendant as the perpetrator. In other words, evidence that, on a prior occasion, the defendant possessed the gun that was used in the Hopkins murder implicates *him* in that murder because it demonstrates his access to the murder weapon.

objection to evidence establishing that the defendant actually shot Rose. Ordinarily, when, as in the present case, the state's case against the defendant includes evidence that the defendant used a weapon in the commission of the crime, and the state can place that weapon in the hands of the defendant during his commission of a prior crime, the defendant will not acknowledge having committed the prior crime. In such circumstances, the only way for the state to prove that the defendant possessed the gun on the earlier occasion is to present evidence establishing the defendant's commission of that prior crime. Because that prior crime evidence generally is a vital element of the state's proof that the accused, as distinguished from anyone else, is guilty of the crime charged, the court is likely to conclude that the risk of any unfair prejudice arising from the state's use of that evidence is outweighed by its probative value. Indeed, the cases on which the majority relies in support of its conclusion that the probative value of the evidence concerning the Rose shooting outweighs its prejudicial effect fall squarely into this category, that is, in each such case, evidence of the defendant's prior possession of the weapon was critical to the state's case, and, because the defendant had not acknowledged possessing the weapon in the commission of a prior crime, the state was entitled to adduce evidence of the commission of that prior crime to prove the defendant's prior possession of the weapon. See, e.g., *United States* v. *Higgs*, 353 F.3d 281, 290–93, 311–12 (4th Cir. 2003), cert. denied, 543 U.S. 999, 125 S. Ct. 627, 160 L. Ed. 2d 456 (2004); *State* v. *Williams*, 992 So. 2d 330, 332–34 (Fla. App. 2008); *People* v. *Brown*, 13 App. Div. 3d 145, 146, 786 N.Y.S.2d 55 (2004), appeal denied, 4 N.Y.3d 828, 829 N.E.2d 676, 796 N.Y.S.2d 583 (2005); *State* v. *Stokes*, 381 S.C. 390, 404–406, 673 S.E.2d 434 (2009); cf. *State* v. *Lemons*, 348 N.C. 335, 351–53, 501 S.E.2d 309 (1998) (although defendant admitted

prior possession of weapon, evidence of prior crime admissible to prove identity), vacated on other grounds, 527 U.S. 1018, 119 S. Ct. 2363, 144 L. Ed. 2d 768 (1999).

Thus, contrary to the assertion of the majority, those cases provide no support for the majority's conclusion because, in the present case, the defendant confessed to the police that he had shot Rose, and he has never challenged the validity or accuracy of that confession. In other words, he never has disputed the fact that he shot Rose. Because the defendant's acknowledgment that he shot Rose necessarily also constitutes an acknowledgment that he possessed the gun that was used in that shooting, there simply was no basis for the court to permit the state to present evidence of the shooting itself. For that reason, evidence of that shooting was irrelevant to any disputed issue in the case. Because irrelevant evidence is inadmissible; see Conn. Code Evid. § 4-2; there is no reason to subject such evidence to the balancing standard prescribed by § 4-3 of the Connecticut Code of Evidence for determining whether *probative* evidence should be excluded due to its overriding prejudicial effect. See, e.g., *United States v. Figueroa*, 618 F.2d 934, 939 (2d Cir. 1980) (to be admissible, evidence of prior misconduct "must be relevant to some disputed issue in the trial").

Alternatively, it may be argued that, although evidence that the defendant shot Rose was relevant to prove the defendant's possession of the gun used in that shooting, the probative value of that evidence was minimal because other uncontested evidence, namely, the defendant's confession to the Rose shooting, established that fact definitively. Indeed, as the majority notes, the Appellate Court appears to assume the relevance of the Rose shooting, concluding, however, that its minimal probative value was far outweighed by its potential for undue prejudice. See *State v. Collins*, supra, 111 Conn. App. 732, 743. When the issue is viewed

from the perspective that the evidence was relevant but, under the circumstances presented, only marginally so, the Appellate Court correctly concluded, contrary to the determination of the trial court, that the risk of unfair prejudice that the evidence posed substantially outweighed its slight probative value.

The majority nevertheless concludes that the trial court properly determined that the evidence was relevant and that its probative value outweighed its potential for unfair prejudice. The majority's conclusion is unsupportable.

With respect to the issue of relevance, the majority reasons that, "[w]ithin the law of evidence, relevance is a very broad concept. . . . All that is required is that the evidence tend to support a relevant fact *even to a slight degree*, [as] long as it not prejudicial or merely cumulative. . . . Given this broad definition, we view the distinction drawn by the defendant and the dissent—namely, that between simple prior possession of the murder weapon, and its actual use in the Rose shooting—as one of degree rather than kind. Thus . . . the analytical key to this particular evidentiary decision lies under the second prong of the uncharged misconduct test, namely, the degree to which the prejudicial effect of the otherwise relevant evidence outweighs its probative value." (Citations omitted; emphasis in original; internal quotation marks omitted.) Footnote 19 of the majority opinion.

In asserting that the evidence of the Rose shooting was relevant, albeit only to a "slight degree"; (internal quotation marks omitted) footnote 19 of the majority opinion; the majority does not address the defendant's claim that the evidence was merely cumulative—and therefore inadmissible—in light of the fact that the state's proof, which was *uncontested by the defendant,* established that the defendant confessed to having pos-

sessed the gun at the time of the Rose shooting. Specifically, the majority never explains why, in light of the undisputed evidence linking the defendant to the gun used in the Rose shooting, the Appellate Court improperly concluded that the state had no legitimate reason to present evidence of the Rose shooting itself. Instead of explaining why the Appellate Court improperly relied on that reasoning in concluding that the trial court had abused its discretion in permitting the state to prove that the defendant shot Rose, the majority ignores the critical distinction between the state's use of evidence proving *that* fact, on the one hand, and the state's use of evidence establishing that the defendant possessed the gun used in that shooting, on the other. Indeed, the majority states that, "[h]aving reviewed the record in this case, we conclude that the Appellate Court improperly determined that the trial court had abused its discretion in determining that the prejudicial effect of the evidence that the defendant *had shot Rose with the same gun used in [the Hopkins] murder* did not unduly exceed its probative value." (Emphasis added.) The majority simply cannot justify reversing the judgment of the Appellate Court without considering and resolving that issue, which provides the primary basis for the Appellate Court's decision and for the defendant's opposition to the state's appeal.

Despite its failure to explain why evidence of the Rose shooting was not needlessly cumulative, the majority nevertheless concludes that the trial court properly determined that the probative value of the evidence, however slight, exceeded its potential for unfair prejudice. Although conceding that "the evidence of the Rose shooting . . . certainly had some prejudicial effect"; footnote 21 of the majority opinion; the majority gives four reasons for its conclusion that the evidence was not unduly prejudicial. None of these reasons is persua-

sive in light of the fact that the evidence was both inflammatory and served no legitimate purpose.

The majority's first reason in support of its determination is the fact that the state did not present detailed evidence of the Rose shooting and that that incident was less serious than the Hopkins murder. Although it is true that the state could have presented more extensive evidence about the Rose shooting, which, of course, would have been even more prejudicial if Rose had not survived the shooting, as the Appellate Court observed, "[t]he testimony relating to the Rose [shooting] clearly fits into the category of evidence that would have unduly aroused the [jurors'] emotions and hostilit[ies] [because] . . . [i]t painted the defendant as a gun toting criminal with a proclivity for shooting people." *State* v. *Collins,* supra, 111 Conn. App. 743. Even though the state did not adduce details of the Rose shooting, and the shooting did not result in Rose's death, it is unreasonable to suggest that evidence of the shooting, which occurred just three months prior to the Hopkins murder, did not give rise to a significant risk of prejudice. The mere fact that the evidence could have been *more* prejudicial does not support the contention that it was only *minimally* prejudicial.

The majority next "find[s] significant the trial court's efforts to have the prosecution admonish its witnesses that any testimony about the Rose shooting was to be limited only to the fact that there was a shooting, with no other details regarding the events of that day." For purposes of performing the balancing required under § 4-3 of the Connecticut Code of Evidence, this contention has no significance independent of the first reason that the majority advances in support of its conclusion.

The third basis for the majority's conclusion is the limiting instruction that the trial court gave to the jury

concerning the restricted purpose for which the Rose shooting evidence had been admitted. The court's instruction is a factor that supports the majority's conclusion because such instructions generally serve to minimize the prejudicial effect of prior misconduct evidence. See, e.g., *State* v. *James G.*, 268 Conn. 382, 397–98, 844 A.2d 810 (2004). As this court has acknowledged, however, the prejudice that invariably flows from the admission of such evidence is high; see, e.g., *State* v. *DeJesus*, 288 Conn. 418, 473, 953 A.2d 45 (2008); *State* v. *Jones*, 234 Conn. 324, 345, 662 A.2d 1199 (1995); and, although the court must give a limiting instruction when requested to do so; Conn. Code Evid. § 1-4; there are circumstances in which a limiting instruction is insufficient to protect the rights of the defendant. E.g., *State* v. *Wright*, 198 Conn. 273, 278–79, 502 A.2d 911 (1986) (limiting instructions given by trial court could not have eliminated likelihood that jurors would infer that defendant was guilty of crime charged because he previously had engaged in similar misconduct); see also Conn. Code Evid. § 1-4, commentary (contemplating possibility that limiting instruction "will not adequately protect the rights of the parties"). This court also has recognized that "the probability of a jury inferring a predisposition to commit the crime with which the defendant stands charged is logically increased when the evidence [of prior misconduct] pertains to misconduct similar to that involved in the case on trial because such evidence creates inevitable pressure on lay jurors to believe that if [the defendant] did it before he probably did so this time." (Internal quotation marks omitted.) *State* v. *Jones*, supra, 345. Thus, "when prior crimes are quite similar to the offense being tried, a high degree of prejudice is created and a strong showing of probative value would be necessary to warrant admissibility." (Internal quotation marks omitted.) *State* v. *Griggs*, 288 Conn. 116, 141, 951 A.2d 531 (2008). In the present case, the

alleged prior misconduct, a shooting involving a gun, was very similar to the conduct for which the defendant was on trial. These considerations, along with the violent nature of the defendant's alleged prior misconduct, undermine whatever effectiveness the court's limiting instruction otherwise might have had.[13]

Finally, the majority relies on "decisions from numerous other federal and state courts that have rejected challenges, founded on undue prejudice, to the use of uncharged misconduct evidence in cases [in which] the charged offenses were committed using the same gun that the defendant had utilized in prior shootings."[14] In fact, as I have explained previously, those decisions provide no support for the majority's conclusion. In each of those cases, as in the present case, the prosecuting authority had sought to prove that the defendant had committed another crime with the same gun that was used in the offense for which the defendant was on trial. Moreover, in each of those cases, as in the present case, the state had a strong and legitimate interest in demonstrating that the same person who had committed the other crime also committed the crime for which the defendant was on trial. In contrast to the present case, however, in all but one of those cases, the defendant had not acknowledged responsibility for the prior shooting, and, in the only case in which the

[13] I also note that the trial court's limiting instructions were hardly a model of clarity, and, in fact, the instruction likely was more confusing than helpful to the jury. In particular, the court told the jury, without further elaboration, that it could consider the evidence of the Rose shooting for purposes of determining "intent" or "opportunity" or as proof of an "element of a crime . . . ." At least in the absence of some additional explanatory comments by the court, I do not see how the court's limiting instruction would have provided guidance to the jury with respect to its proper use of the evidence demonstrating that the defendant had shot Rose.

[14] The cases that the majority cites are: *United States* v. *Higgs*, supra, 353 F.3d 312, *State* v. *Williams*, supra, 992 So. 2d 330, *People* v. *Brown*, supra, 13 App. Div. 3d 145, *State* v. *Lemons*, supra, 348 N.C. 335, and *State* v. *Stokes*, supra, 381 S.C. 390.

defendant did admit involvement in the other crime, evidence of that crime was admitted under an altogether different theory. See *State* v. *Lemons*, supra, 348 N.C. 351–53 (evidence of prior misconduct properly admitted as signature crime evidence). Thus, in those cases, in contrast to the present case, the prosecution's use of the prior misconduct evidence was necessary to link the defendant to the gun that had been used in the other crime, proof of which was necessary to link the defendant to the gun used in the case being tried.[15] Those cases, therefore, are completely inapposite to the present case, in which evidence of the prior shooting is wholly unnecessary to link the defendant to the gun that he used on that prior occasion.[16]

---

[15] In fact, the one case that bears the most similarity to the present case, namely, *Thompson* v. *State*, 690 N.E.2d 224 (Ind. 1997), supports the conclusion of the Appellate Court that the trial court improperly permitted the state to present evidence of the Rose shooting. In *Thompson*, the defendant, Jerry K. Thompson, was charged with two counts of murder. See id., 227–28. To prove its case against Thompson, the state sought to introduce evidence that he had stolen the murder weapon, a handgun, in the course of committing a different murder approximately one month earlier. Id. The trial court allowed the state to adduce evidence of the circumstances surrounding Thompson's theft of the handgun, including evidence of his involvement in and conviction of the earlier murder. See id., 231–32. Following Thompson's conviction, he appealed, claiming, inter alia, that the evidence of the prior murder was both unnecessary and unduly prejudicial. See id., 233–37. In reversing Thompson's conviction, the Supreme Court of Indiana concluded that, although the state was entitled to establish generally how and when Thompson had obtained the murder weapon, it was unnecessary, and therefore improper, for the state to have elicited the highly prejudicial testimony about the prior murder. Id., 236–37. As in *Thompson*, the state in the present case had every right to prove that the defendant had possessed the gun that was used in the Rose shooting, but, because proof of the Rose shooting was completely unnecessary to establish the defendant's prior possession of the gun, the state's use of that prejudicial evidence was improper.

[16] The majority also asserts that the prejudicial effect of the evidence was not "undue or unreasonable" in light of the alternative suggested at trial by the defendant's standby counsel, namely, that the state's proof be limited to a showing that the defendant had discharged the gun on a prior occasion. Footnote 21 of the majority opinion. The majority reaches this conclusion on the basis of its contention that there is no appreciable difference in the prejudicial effect of evidence demonstrating that the defendant once had

In sum, because the state had absolutely no need to adduce evidence of the Rose shooting for the purpose of linking the defendant to the gun used in that shooting, the evidence is properly characterized as either irrelevant or needlessly cumulative. The majority, however, *fails completely to address that fact* in concluding that the trial court properly determined that the probative value of the challenged evidence outweighed its prejudicial effect. Indeed, the majority simply ignores that aspect of the balancing test despite having acknowledged the slight probative value of the evidence in rejecting the defendant's claim that the evidence was irrelevant and, therefore, inadmissible. Moreover, as the Appellate Court explained, evidence that the defendant had shot Rose just three months prior to the Hopkins murder was highly prejudicial to the defendant because of the likelihood that the jury would view the defendant as a person with violent propensities, including a propensity for shooting people. See *State* v. *Collins*, supra, 111 Conn. App. 743. In such circumstances, that is, when evidence is devoid of probative value and its potential for unfair prejudice is great, the evidence nec-

discharged the gun as opposed to evidence demonstrating that the defendant actually had shot another person, namely, Rose. In my view, the majority blinks at reality in equating the nature and extent of the prejudice attendant to the innocent discharge of a gun and the intentional shooting of another. Indeed, the significance of this distinction is self-evident: many, if not most, gun owners have discharged a gun, whereas exceedingly few gun owners ever have shot another person for any reason, let alone intentionally. Moreover, any possible prejudice arising out of the evidence establishing that the defendant merely had discharged the gun would have been minimal because the court would have instructed the jury that it could not consider that evidence for any purpose other than to demonstrate the defendant's possession of the gun. In essence, the jury would have been required to presume that the discharge of the gun was entirely innocent or innocuous, an instruction that the jury would have had no difficulty following in view of the fact that there would have been no evidence adduced at trial even to suggest a contrary conclusion. No such instruction could have ameliorated the prejudice associated with evidence demonstrating that the defendant had fired at and struck Rose.

essarily is inadmissible in accordance with § 4-3 of the Connecticut Code of Evidence. Indeed, even if the evidence may be deemed to have some slight relevance, as the majority maintains, its minimal probative value clearly is outweighed by its prejudicial effect.[17]

Moreover, contrary to the state's contention on appeal, evidence of the Rose shooting was not admissible either to prove motive or to corroborate Finney's testimony.[18] With respect to motive, the state argues that, because of his involvement in the Rose shooting, the defendant was trying to evade the police, and he could not do so successfully while maintaining a steady

---

[17] The majority maintains that I have not afforded proper deference to the trial court's evidentiary ruling concerning the admissibility of the Rose shooting. Of course, rulings pertaining to the admissibility of evidence are entitled to substantial deference. Because evidence of the Rose shooting was so lacking in probative value, however, and because its potential for unfair prejudice was so great, the trial court reasonably could not have permitted the state to adduce evidence of that shooting. In such circumstances, proper deference to the trial court's ruling cannot save it because such deference does not relieve this court of its obligation to reject evidentiary rulings that are unreasonable.

[18] Although evidence of the Rose shooting ordinarily would be relevant to establish the identity of the defendant in the sense that such evidence tends to identify him as the perpetrator; see footnote 12 of this opinion; I disagree with the majority's suggestion that the evidence was admissible as a signature crime to prove identity. See footnote 17 of the majority opinion and accompanying text. "To be admissible for that purpose, the factual characteristics shared by the charged and uncharged crimes must be sufficiently distinctive and unique as to be like a signature [so that] it logically could be inferred that if the defendant is guilty of one [crime] he must be guilty of the other." (Internal quotation marks omitted.) *State* v. *Snelgrove*, 288 Conn. 742, 765, 954 A.2d 165 (2008). Thus, "[m]uch more is required than the fact that the offenses fall into the same class. The device used must be so unusual and distinctive as to be like a signature." (Internal quotation marks omitted.) *State* v. *Ibraimov*, 187 Conn. 348, 354, 446 A.2d 382 (1982). Aside from the fact that Rose and Hopkins were shot with the same gun, there is nothing unusual or unique about those two shootings. In fact, certain important dissimilarities are apparent; for example, according to the state's proof, the reason for the Rose shooting and the motive for the Hopkins murder were completely different. Consequently, it is absolutely clear that evidence of the Rose shooting was not admissible as a signature crime for the purpose of proving identity.

job; consequently, the defendant was unemployed, and, to support himself, he resorted to robbing people, among them, Hopkins. Although it may be possible to trace the defendant's unemployment to the Rose shooting, the fact that the defendant was not employed was undisputed, and it was his unemployed status that allegedly caused him to turn to robberies as a means of support. Thus, the state would have had no difficulty in establishing the defendant's need for money, and thus his motive for robbing and shooting Hopkins, without evidence of the Rose shooting. Indeed, even if it is assumed that proof of motive required evidence that the defendant was on the run from the police when Hopkins was murdered, there is no reason why the state could not have established that fact without use of the highly prejudicial evidence relating to the Rose shooting. Thus, evidence of the Rose shooting was not necessary to prove motive and, therefore, not admissible for that purpose.

The state's claim and the majority's unsupported assertion that the evidence was admissible to corroborate the prosecution testimony of Finney in accordance with § 4-5 (b) of the Connecticut Code of Evidence also lacks merit.[19] "Other crimes evidence . . . is only admissible for corroborative purposes . . . if the corroboration is direct and the matter corroborated is significant." (Internal quotation marks omitted.) *State* v. *Mooney*, 218 Conn. 85, 129, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991); see also *United States* v. *Mohel*, 604 F.2d 748, 754 (2d Cir. 1979) (applying identical standard). Thus, otherwise inadmissible prior misconduct evidence that directly corroborates only those portions of a witness' testimony that are themselves irrelevant and inadmissi-

---

[19] The majority merely asserts, in conclusory fashion, that evidence of the Rose shooting was admissible to corroborate Finney's testimony. The majority, however, provides no explanation to support its assertion.

ble is neither direct nor significant for purposes of the corroboration exception. See, e.g., *State* v. *Llera*, 114 Conn. App. 337, 343–44, 969 A.2d 225 (2009).

In the present case, evidence that the defendant shot Rose, including Finney's testimony to that effect, was itself inadmissible. Thus, evidence that the defendant shot Rose "is not rendered admissible merely because it corroborates another equally inadmissible statement on the same subject." *United States* v. *Mohel*, supra, 604 F.2d 754. Furthermore, the corroboration was not direct because the evidence corroborated only that aspect of Finney's testimony relating to the Rose shooting, which was irrelevant to the issue of whether the defendant murdered Hopkins. See *State* v. *Llera*, supra, 114 Conn. App. 344 (rule that "[o]ther crimes evidence . . . is . . . admissible for corroborative purposes . . . [only] if the corroboration is direct and the matter corroborated is significant . . . would be meaningless if it was satisfied merely because evidence of another crime had a general tendency to corroborate the testimony of a witness who coincidentally testified about [that unrelated crime]" [citation omitted; internal quotation marks omitted]). Finally, proof that Finney might have been truthful on the witness stand concerning a matter wholly unrelated to the crimes at issue "is hardly 'significant' within the meaning of [our jurisprudence]." *United States* v. *Mohel*, supra, 755. Thus, evidence that the defendant shot Rose could not have been used by the state to corroborate Finney's inadmissible testimony to that same effect.[20]

---

[20] The state also contends that evidence of the Rose shooting "was highly probative because it helped the jury understand how the defendant became a suspect in [the Hopkins] murder." Although the state frequently will be permitted to demonstrate how an accused came to the attention of the police, there is nothing in our law that affords the state a right to do so. Indeed, such evidence generally is unimportant to the state's case. In the present case, there was absolutely no need for the state to get into that aspect of the investigation, and, to whatever limited extent such evidence might have appealed to one or more jurors' curiosity, any interest that

Finally, I agree with the Appellate Court that the trial court's improper admission of the highly prejudicial evidence concerning the Rose shooting was not harmless. See *State* v. *Collins*, supra, 111 Conn. App. 744. "[T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Beavers*, 290 Conn. 386, 419, 963 A.2d 956 (2009). As the Appellate Court succinctly explained, "[t]he defendant's first trial resulted in a hung jury and a mistrial. Similarly, in the trial that resulted in [his conviction] . . . the jury twice indicated that it was deadlocked . . . . There was no eyewitness to the crime, and the only tangible evidence linking the defendant to the crime was the shell casing and a fingerprint. Given the overall strength of the state's case, we cannot say that we have a fair assurance that the error did not substantially affect the verdict." *State* v. *Collins*, supra, 744. Because the impropriety was not harmless, the defendant is entitled to a new trial.

Therefore, I respectfully dissent.

---

the state may have had in using the evidence for that purpose was vastly outweighed by its high potential for unfair prejudice.

